## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MORAD TAHBAZ,
TARA VIDA TAHBAZ,
TEYMOOR NADER TAHBAZ,
ROXANNE VIDA TAHBAZ,
TARANEH TAHBAZ,

    and

HAMIDEH AFSHAR

               Plaintiffs,

    v.

ISLAMIC REPUBLIC OF IRAN,
ISLAMIC REVOLUTIONARY GUARD
CORPS,
c/o Ministry of Foreign Affairs
Khomeni Avenue, United Nations Street
Tehran, Iran

               Defendants.

Civil Action No. 1:24-cv-02640

## **COMPLAINT**

1.    Plaintiffs Morad Tahbaz, Tara Vida Tahbaz, Teymoor Nader Tahbaz, Roxanne Vida Tahbaz, Taraneh Tahbaz, and Hamideh Afshar (collectively, the "Tahbaz Family" or "Plaintiffs") bring suit against Defendants the Islamic Republic of Iran and the Islamic Revolutionary Guard Corps ("IRGC") (collectively, "Iran" or "Iranian Government" or "Defendants") under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq*. ("FSIA"), for Defendants' unlawful acts of terrorism, torture, hostage taking, and other torts that inflicted on the Tahbaz Family severe personal injuries and massive irreparable harm, for which they now seek damages and other relief to which they are entitled under U.S. law.

2.      The Iranian Government targeted and arrested Morad Tahbaz based upon his U.S. citizenship and perceived value as a high-profile U.S. hostage, subjected him to torture and other cruel and inhuman treatment, and held him hostage for *five-and-three-quarters years* (2,077 days), for the inhumane and unlawful purpose of extorting concessions from the U.S. Government and others.  At the time of his arrest in January 2018, Morad had traveled from his home in the United States to Iran for the lawful purposes of visiting family, handling family-related legal affairs, and conducting volunteer environmental work to save endangered wildlife in Iran.  In 2008, Morad founded the Persian Wildlife Heritage Foundation ("PWHF" or "Foundation"), a non-profit organization dedicated to the conservation of Iran's wildlife and natural beauty.  Iran had granted permission for the PWHF's work and was benefitting from its environmental stewardship.  It had absolutely no legal basis to arrest or imprison Morad.

3.      Plaintiffs' nightmare began on November 16, 2017, when Morad and his family attempted to leave Iran after visiting Morad's elderly in-laws and performing volunteer environmental work for the PWHF.  Morad was taken into custody, interrogated by agents of the IRGC, forced to surrender his passport, and prohibited from leaving Iran.  Morad successfully recovered his passport after questioning by IRGC agents, but when he again tried to leave the country on November 22, 2017, the IRGC once again seized his passport.

4.      Plaintiffs' nightmare continued on January 10, 2018, when Morad was required to report to an IRGC safehouse for further interrogation.  Foreshadowing the torture to come, the IRGC used violence to intimidate and terrorize Morad while they detained and interrogated him. They slammed him against walls, shackled his wrists, cinched a blindfold tightly around his head, shoved him in a car, and shocked him with electrical prods.  The IRGC agents drove Morad to the notorious Evin Prison on the outskirts of Tehran, where the Iranian regime holds hostages and

other political prisoners, keeps them in deplorable conditions, brutally interrogates them, and subjects them to physical abuse, psychological terror and, as the U.S. Department of State has reported, "cruel and prolonged torture."[1]

5.     For 2,077 terrifying days—from January 10, 2018, to September 18, 2023—IRGC and other Iranian agents tortured, tormented, and terrorized Morad using a cruel and inhumane combination of harsh physical abuse and psychological torture.  They held him in prolonged solitary confinement, deprived him of sleep, aggressively and relentlessly interrogated him, denied him basic medical treatment for serious and painful illnesses and infections, and threatened him with dismemberment, execution, and other forms of cruel and unusual physical torture.  They also threatened to harm other Plaintiffs and family members, including Morad's wife, Vida, whom the IRGC also interrogated, terrorized, and prohibited from leaving Iran while Morad was held hostage.

6.     For most of the 2,077 days that Iran held Morad hostage, he suffered extreme psychological duress and serious illnesses, infections, and other health complications, including numerous severe cases of COVID-19 during the height of the pandemic, painful and recurrent urethral strictures, urinary tract infections, gastrointestinal disorders, kidney dysfunction, and bursitis of the hip, all without adequate medical care or treatment.  Iran and the IRGC severely and intentionally exacerbated Morad's illnesses, infections, and other health problems as part of a cruel regimen designed to intensify and prolong his physical mistreatment and psychological torture.

7.     Iran and the IRGC had no legal or factual basis to imprison Morad, so they falsely claimed he was "spying" for the United States.  This was a blatant lie, fabricated by Iran and the

---

[1]     U.S. Dep't of State, *Iran 2015 Human Rights Report*, at 5 (Apr. 13, 2016), https://2009-2017.state.gov/documents/organization/253135.pdf.

IRGC as a pretext to hold Morad hostage, put him on "trial" in sham legal proceedings, obtain fake "convictions" for espionage and other high crimes, and thereby generate pressure on the United States and others to exchange prisoners or make other concessions for his release. The judge who oversaw Morad's so-called "trial" was the notorious Judge Abdolgassem Salavati, known as the "hanging judge," who has been sanctioned by the United States and the European Union for gross violations of human rights, including the mass, indiscriminate sentencing of political protesters and dissidents. Acting on behalf of the IRGC, Salavati deprived Morad of due process, denied him counsel of his choosing, afforded him no time to prepare a defense, barred him from presenting any witnesses or evidence, and found him guilty without a shred of evidence to support the charges. Salavati and Defendants made no effort to hide the fact that the criminal case against Morad was nothing but pretext for taking and holding him hostage.

8.     Morad committed no crime and was never legitimately tried, convicted, or sentenced—even according to Iranian standards. Iran arrested and imprisoned Morad not because of anything he did, but rather because of who he was and the perceived "value" that Iran assigned to him as a U.S. citizen, prominent and successful businessman, and environmentalist who could be traded for concessions from the United States. Iranian officials saw opportunity in Morad as a high-profile prisoner who would be valuable in a trade to the United States and could be exchanged for something of significance to Iran.

9.     Although Morad survived and was released as part of a deal with the United States, Iran and the IRGC inflicted deep and permanent injuries on him, his wife, his children, his sister, and his mother. For 2,077 days, Morad suffered such severe physical abuse and psychological torture in Evin Prison that he and his family will never be the same; they will each require time and resources to heal and will likely require some form of specialized medical and other treatment

for the rest of their lives.  Even with the best available treatment, they will each bear the permanent injuries and effects of this years-long nightmare.

10.     Despite the severity of their injuries, Plaintiffs are committed to putting their lives back together.  One critical element of this effort is holding Defendants accountable in this Court for the terrorism, torture, hostage taking, and other abuses they committed against Morad and his family.  Congress enacted the "terrorism exception" to the FSIA for just such a case—to provide American victims with legal recourse and an "economic weapon" against rogue states that "consider terrorism a legitimate instrument of achieving their foreign policy goals." Comprehensive Antiterrorism Act of 1995, H.R. Rep. No. 104-383, 104th Cong. at 62 (1995).  For five-and-three-quarters years, Iran held Morad hostage and terrorized him for the inhumane, cruel, cynical, and unlawful purpose of gaining negotiating leverage against the United States in order for Defendants to achieve their geopolitical and other objectives in any deal with the United States. Plaintiffs seek justice and redress from this Court in order to compensate Plaintiffs for their pain and suffering as well as to punish Defendants and otherwise hold them accountable for their heinous, inhumane, and unlawful acts of terrorism, torture, abuse, and hostage taking.

## **PARTIES**

11.     Plaintiff Morad Tahbaz is a U.S. citizen and a resident of Connecticut.  He was born in London, England, on October 1, 1955, and has U.K. citizenship by birthright.  He is the son of a French-Iranian mother, Plaintiff Hamideh Afshar, who was born in Iran, fled that country after the Islamic Revolution in 1979, and now lives in Spain, and an Iranian father, Ghasem Tahbaz, who was born in Iran, fled after the Revolution, and is now deceased.  Morad moved to the United States for high school in 1971 and became a naturalized U.S. citizen on April 20, 2001.  After completing university and business school in the United States, Morad launched his career and eventually became a very successful real estate developer, entrepreneur, and investor.  In 1980, he

married Vida Modjtabai and they settled in Connecticut, where they raised their three children—daughters Roxanne and Tara, and son Teymoor. As U.S. citizens and residents, Morad, Vida, and their children periodically traveled to Iran without incident to visit Vida's parents and other family and friends. On their family visits to Iran, Morad observed increasing levels of pollution and environmental degradation in Iran, which lacked local non-governmental organizations committed to environmental protection. To help fill this void, Morad and several others created the PWHF to help protect biodiversity and raise public awareness about the declining state of wildlife and the environment in Iran. Under Morad's leadership, the PWHF obtained all the necessary permissions under Iranian law and worked in collaboration with the Iranian Government, the United Nations, and others to help protect threatened species in Iran, such as the Asiatic cheetah. Roughly a decade after the organization's founding, Morad was volunteering for the PWHF during a family visit to Iran in 2017 when he and other PWHF volunteers were unlawfully arrested, detained, and imprisoned by Defendants, based on completely false and unfounded allegations of spying and espionage. In reality, Morad was targeted by Defendants for political reasons, based upon his U.S. citizenship and potential geopolitical value to the Iranian regime. Morad was held hostage by Defendants for a total of 2,077 days, starting January 10, 2018, and ending September 18, 2023. During this time, Defendants held Morad in solitary confinement, terrorized him, subjected him to relentless interrogations, denied him adequate medical care for painful infections and life-threatening sicknesses, deprived him of sleep, threatened to kill and maim him and his family members, and physically assaulted and injured him. As a result of Defendants' torture, terrorism, and hostage taking, Morad suffered extreme psychological trauma; permanent hearing loss; life-threatening damage to his kidneys, urinary tract, and urethra; and other serious harms detailed

below.  Morad continues to suffer from numerous physical and emotional injuries and symptoms resulting from his lengthy detention, torture, and deprivation of adequate medical care.

12.    Plaintiff Roxanne Vida Tahbaz is the oldest daughter of Morad and Vida.  She is a U.S. citizen and resident of London, England.  She was born on July 8, 1986 in New York City and was raised by Morad and Vida in Connecticut with her siblings.  During the five-and-three-quarters years that Morad was held hostage by Defendants, Roxanne suffered the severe psychological trauma of not knowing if she would ever see her parents again.  Morad was being held *in communicado* in Evin Prison and Vida was barred from leaving Iran.  Unable to travel there, Roxanne was forced to do what she could from London, where she became a spokeswoman for the family's efforts to free Morad and bring her parents home.  As the public face of the "#FreeMorad" campaign, she conducted more than 80 interviews, including televised and print-press interviews.[2]  Her father's detention, and her work to free him, put a significant strain on her family, her relationships, her professional life, and her finances.  Defendants' imprisonment and abuse of her father caused Roxanne to suffer in ways that severely hurt her physical and psychological health.  As a result of her father's detention, and her intensely public work to secure his release, Roxanne suffered from anxiety, panic attacks, stress-induced hair loss, insomnia, and weight gain.  She also suffered personal and professional opportunity costs as a result of her father's detention and her efforts to raise public awareness about his plight.  In addition, Roxanne has reason to believe that Defendants' agents followed and surveilled her, which added

---

[2]    The #FreeMorad campaign was a public advocacy effort organized by the Tahbaz family which sought to raise awareness of Morad's illegal detention, advocate for his release, and pressure the U.K. and U.S. Governments to action.  The campaign was affiliated with Amnesty International's "No-one left Behind Campaign" to free British nationals unjustly detained in Iran. *See Action Toolkit For British Nationals Detained in Iran*, AMNESTY INT'L U.K. (Oct. 11, 2022), https://www.amnesty.org.uk/UnjustDetentionToolkit.

significantly to her fear and anxiety. Roxanne continues to suffer from physical and emotional harm and symptoms resulting from her father's lengthy detention and torture and her efforts to secure his release, including persistent stress and weight gain.

13.    Plaintiff Tara Vida Tahbaz is the daughter and second child of Morad and Vida. She is a U.S. citizen and a resident of Connecticut. She was born on February 10, 1989 in New York City, and was raised by Morad and Vida in Connecticut. She was present on the family trip to Iran in 2017, when Morad was detained. During the five-and-three-quarters years that Defendants held Morad hostage and prevented Vida from leaving Iran, Tara managed the family's affairs and assisted significantly with the effort to free Morad from prison. Morad's detention and Tara's work to help secure his release put a significant strain on her family, her relationships, her professional life, and her finances. In particular, Morad's detention greatly affected Tara's ability to maintain her employment and advance her career. As a result of her father's detention, Tara suffered from anxiety, severe depression, and stress-induced hair loss. In addition, Tara has reason to believe she was followed and surveilled by agents of Defendants, adding significantly to her anxiety. Tara continues to suffer from physical and emotional harm and symptoms resulting from her father's lengthy detention and torture and her efforts to secure his release, including persistent anxiety and depression.

14.    Plaintiff Teymoor Nader Tahbaz is the son and youngest child of Morad and Vida. He is a U.S. citizen and a resident of Connecticut. He was born on September 21, 1993 in Norwalk, Connecticut, and was raised by Morad and Vida in Connecticut. Teymoor described his father as his "idol and best friend." During the time Morad was held hostage by Defendants, Teymoor worried constantly about his parents' survival and suffered from their absence. He was just beginning his career and struggled to gain his footing without his father's support, counsel, and

companionship.  Teymoor was forced to resign from his job so he could support his family during the crisis.  His personal relationships were also strained during this period, as he often felt unsafe and feared that he was being watched, even in his own home.  Given Defendants' global reach and desire to target Americans, Teymoor worried what they might do to him and his family.  His fear and sense of vulnerability, even in the United States, was due, in part, to what he perceived to be Defendants' repeated attempts to hack or breach his electronic devices and his and his parents' online accounts during his father's detention.  Teymoor still suffers from physical and emotional harm and symptoms resulting from his father's lengthy detention and torture, including high blood pressure and anxiety.

15.    Plaintiff Taraneh Tahbaz is Morad's sister.  She is a Spanish citizen and a resident of Spain.  She was born on March 21, 1954 in Tehran, Iran and is Morad's only sibling.  During the five-and-three-quarters years that Morad was held hostage by Defendants, Taraneh quit her job and worked tirelessly on a full-time basis to secure her brother's release.  She frequently traveled at her own expense to advocate for her brother's release and meet with government, European Union, and United Nations officials in London, Brussels, and New York City.  Due to the stress of her brother's detention, Taraneh developed a lymphatic disorder and suffered from anxiety and other physical and mental health problems.  Taraneh continues to suffer from physical and emotional harm and symptoms resulting from her brother's lengthy detention and torture and her efforts to secure his release, including her lymphatic disorder and persistent anxiety and depression.

16.    Plaintiff Hamideh Afshar is Morad's mother.  She is a dual citizen of France and Iran and a resident of Spain.  She was born on May 23, 1929 in Tekab, Iran (then known as Persia) and is now 95 years old.  Until Morad was taken hostage, Hamideh was living on her own in

Madrid.  Shortly after Morad was imprisoned, however, Hamideh suffered extreme emotional distress, including a severe medical incident that required a weeks-long stay in the hospital and caused her to lose her memory.   Her doctors have said that the incident was caused by extreme stress, a result of Defendants arresting and holding her son hostage.  Although Hamideh recovered from that incident, she continued to suffer extreme stress from Morad's detention and was not able to continue living on her own.  Accordingly, she moved in with her daughter, Taraneh, and the family hired two health aides to assist her in her weakened state.  Hamideh continues to live with Taraneh and requires assistance from home health aides.  She continues to suffer from physical and emotional harm and symptoms resulting from her son's lengthy detention and torture.

17.    Defendant the Islamic Republic of Iran is a "foreign state" within the meaning of the FSIA.  28 U.S.C. § 1603(a).  Iran is a theocratic autocracy led by a dictatorial head of state— the Supreme Leader—who is appointed for life by a council of mullahs trained in strict Shi'a theology.  The Supreme Leader controls the Guardian Council of the Constitution, which interprets the Iranian Constitution, selects candidates for President and other public offices, supervises purported elections (including by determining which candidates may run), and exercises significant influence and control over all officials and government institutions, including the IRGC.  The U.S. Department of State has designated Iran as a "State Sponsor of terrorism" within the meaning of U.S. law (Export Administration Act of 1979, 50 U.S.C. App. § 2405(j); 22 U.S.C. §§ 2371, 2780), reflecting the Department's conclusion that Iran has "repeatedly provided support for acts of international terrorism."[3]  In 2022, the U.S. Department of State reiterated that "Iran continued to be the leading state sponsor of terrorism, facilitating a wide range of terrorist and

---

[3]      Determination Pursuant to Section 6(i) of the Export Administration Act of 1979 — Iran, 49 Fed. Reg. 2,836 (Dep't of State Jan. 23, 1984); *State Sponsors of Terrorism*, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism/ (last visited Sept. 9, 2024).

other illicit activities around the world."[4]   Iran uses terrorism, torture, and hostage taking as instruments of foreign policy and international relations.  *See e.g.*, U.S. Dep't of State, *Country Reports on Terrorism 2022*, at 4 (noting that "Iran continued to be the leading state sponsor of terrorism, facilitating a wide range of terrorist and other illicit activities around the world … as in past years, the Iranian Government continued supporting terrorist plots or associated activities targeting dissidents and other perceived enemies of the regime.").[5]

18.     Defendant the Iranian Revolutionary Guard Corps, or IRGC, is an agency of Iran within the meaning of the FSIA.  28 U.S.C. § 1603(b).  It is a military, security, and intelligence organization under the control of the Supreme Leader and the Guardian Council.  The IRGC was established in the wake of the Islamic Revolution, purportedly to act as the country's "ideological custodian,"[6] but it is widely understood to be Iran's and the Supreme Leader's security force and intelligence organization, as well as the most reactionary, powerful, and oppressive part of the Iranian Government.  The IRGC fields an army, navy, air force, and intelligence service that operate inside and outside Iran.  It conducts foreign operations principally through its paramilitary arm, the Quds Force.  The Quds Force has primary responsibility for arming pro-Iranian military groups across the Middle East and beyond and has been designated by the U.S. Department of the Treasury as a sponsor and supporter of terrorism.[7]   The IRGC, which conducts and promotes terrorism both inside and outside of Iran, has been designated by the U.S. Department of State as

---

[4]      U.S. Dep't of State, *Country Reports on Terrorism 2022*, at 4, https://www.state.gov/wp-content/uploads/2023/11/Country_Reports_on_Terrorism_2022-v3.pdf (last visited Sept. 9, 2024).

[5]      https://www.state.gov/wp-content/uploads/2023/11/Country_Reports_on_Terrorism_2022-v3.pdf.

[6]      CFR.org Editors, *Iran's Revolutionary Guard*, COUNCIL ON FOREIGN RELS., https://www.cfr.org/backgrounder/irans-revolutionary-guards (last updated Apr. 17, 2024).

[7]      In the Matter of the Designation of the Islamic Revolutionary Guard Corps (and Other Aliases) as a Foreign Terrorist Organization, 84 Fed. Reg. 15,278 (Dep't of State Apr. 15, 2019).

a "Foreign Terrorist Organization" within the meaning of U.S. law,  8 U.S.C. § 1189, based on the Department's conclusion that the IRGC "has actively engaged in terrorism and created, supported, and directed other terrorist groups … [and] plans, organizes, and executes terror campaigns all around the world."[8]  The IRGC uses terrorism, torture, and hostage taking as instruments of foreign policy and international relations.  *See* U.S. Dep't of State, *Designation of the Islamic Revolution Guard Corps* (Apr. 8, 2019) ("The IRGC has been directly involved in terrorist plotting; its support for terrorism is foundational and institutional, and it has killed U.S. citizens.  It is also responsible for taking hostages and wrongfully detaining numerous U.S. persons, several of whom remain in captivity in Iran today.").[9]

19.     Given the IRGC's role as the overseer and implementer of Iranian terrorism and hostage taking, it is responsible for arming, training, and overseeing terrorist cells within the IRGC and also in Iranian-aligned terrorist organizations, such as Hezbollah,  Hamas, and the Houthis.[10]

20.     Defendants, and other responsible agencies or instrumentalities of the Government of Iran, are each and collectively a "foreign state" within the meaning of the FSIA.  *See* 28 U.S.C. § 1603.

---

[8]     *Id.*; Michael R. Pompeo, Sec'y of State, Remarks to the Press: Secretary Pompeo Announces Intent To Designate IRGC as a Foreign Terrorist Organization (Apr. 8, 2019), https://eg.usembassy.gov/secretary-pompeo-announces-intent-to-designate-irgc-as-a-foreign-terrorist-organization; *Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization*, WHITE HOUSE (Apr. 8, 2019), https://web.archive.org/web/20190408144504/https://www.whitehouse.gov/briefings-statements/statement-president-designation-islamic-revolutionary-guard-corps-foreign-terrorist-organization/.

[9]     https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/.

[10]     U.S. House of Representatives, Congresswoman Claudia Tenney, *Report on IRGC Terrorist Activity* (Apr. 14, 2023), https://tenney.house.gov/sites/evo-subsites/tenney.house.gov/files/evo-media-document/2023_Tenney_Report_Opportunity_V5.pdf.

**JURISDICTION AND VENUE**

21.    This Court has jurisdiction pursuant to the FSIA, 28 U.S.C. §§ 1330, 1331, and 1605A.

22.    This action falls within the "terrorism exception" to sovereign immunity under the FSIA, 28 U.S.C. § 1605A(a)(1), which provides, in relevant part, that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States … in any case … in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture … [or] hostage taking … if such act … is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."

23.    This suit seeks money damages against Iran and its agencies and instrumentalities, including the IRGC, for injury and harm caused to the Plaintiffs by acts of terrorism, torture, and hostage taking against Plaintiffs.

24.    These acts of terrorism, torture, and hostage taking were perpetrated by officials, members, and agents of Iran, the IRGC, and other agencies and instrumentalities of Iran, while acting within the scope of their official capacities.

25.    Plaintiffs Morad Tahbaz, Tara Tahbaz, Teymoor Tahbaz, and Roxanne Tahbaz are U.S. citizens and nationals of the United States within the meaning of the FSIA and were such at all relevant times, including at the time of the acts of terrorism, torture, and hostage taking that occurred from 2018 to 2023, as alleged herein. *See* 28 U.S.C. § 1605A(a)(2)(A)(ii) ("The court shall hear a claim under [the FSIA] if … the claimant or the victim was, at the time the act … occurred a national of the United States.").

26.    Plaintiff Taraneh Tahbaz is a citizen of Spain. Plaintiff Hamideh Afshar is a citizen of France and Iran. Where, as here, there is an applicable exception to sovereign immunity under the FSIA, non-citizen plaintiffs who are immediate family members of the primary U.S. victim(s)

may pursue claims against a foreign state under applicable state or foreign law.  *See Owens v. Republic of Sudan*, 864 F.3d 751, 807-808 (D.C. Cir. 2017), *rev. on other grounds Opati v. Republic of Sudan,* 590 U.S. 418 (2020).

27.    Defendant Iran has, since January 19, 1984, been designated a "state sponsor of terrorism" by the U.S. Secretary of State for purposes of section 6(j) of the Export Administration Act of 1979, section 620A of the Foreign Assistance Act of 1961, and section 40 of the Arms Export Control Act.  Defendant IRGC is an agency of Iran under 28 U.S.C. § 1603(b), a designated Foreign Terrorist Organization under 8 U.S.C. § 1189, and an "integral part[] of Iran's political structure, and thus constitute[s] a foreign state" for purposes of the FSIA's "terrorism exception."[11] Thus, Defendants are a "state sponsor of terrorism" within the meaning of the FSIA.[12]  *See* 28 U.S.C. § 1605A(a)(2)(A)(i)(I) ("The court shall hear a claim under [the FSIA] if … the foreign state was designated as a state sponsor of terrorism at the time the act … occurred[.]").

28.    Venue for a civil action against a foreign state lies in this Court pursuant to 28 U.S.C. § 1391(f)(4) (venue is proper in the United States District Court for the District of Columbia "if the action is brought against a foreign state or political subdivision thereof").

## STATEMENT OF FACTS

## I.    Morad's Early Life In The United Kingdom And The United States

29.    Morad was born in London in 1955 to Iranian parents, Plaintiff Hamideh Afshar and Ghasem Tahbaz.

---

[11]    *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 180 (D.D.C. 2010); *see also Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 80-81 (D.D.C. 2017) ("[I]t is well-established … that … IRGC [is] the functional equivalent of Iran, thus qualifying as [a] 'foreign state[]' as defined by the FSIA.").

[12]    U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/ (last visited Sept. 9, 2024).

30.     In 1971, after finishing the tenth grade, Morad moved to the United States where he attended a private high school, Oxford Academy, in New Jersey.  After graduating from Oxford Academy, Morad earned his bachelor's degree in philosophy and fine arts from Colgate University ("Colgate") in New York.  Morad graduated from Colgate in 1977.

31.     Roughly a year later, in late 1978 and early 1979, the Islamic Revolution (the "Revolution") broke out in Iran, where extremist revolutionaries raided the U.S. Embassy and took dozens of American hostages who were held for 444 days.  The Revolution resulted in the fall of the U.S.-supported government led by Shah Mohammed Reza Pahlavi and the rise of an ultra-conservative Islamist government led by Ayatollah Khomeini,[13] who established the IRGC.[14]  In 1980, war broke out between Iraq and Iran leading to an "eight-year conflict that resulted in hundreds of thousands of casualties on both sides."[15]

32.     Following the Revolution, the extremist regime sought retribution against those who were perceived as having been aligned with the Shah's government.  Fearing for his physical safety, Morad's father, Ghasem, escaped Iran to join Morad and the family in the West.  Morad's father, Ghasem, was the last member of the immediate family to escape from Iran.

33.     Although he was physically safe outside Iran, Ghasem still faced retribution for his perceived affiliation with the Shah.  During Morad's youth, Ghasem had managed a range of assets and businesses in Iran.  Most of Ghasem's work dealt with the acquisition and development of residential properties in and around Tehran, but he also had a stake in a newspaper group, owned commercial properties and industrial plants, and operated marble quarries and manufacturing

---

[13]     Suzanne Maloney & Keian Razipour, *The Iranian Revolution – A Timeline of Events,* BROOKINGS INST. (Jan. 24, 2019), https://www.brookings.edu/articles/the-iranian-revolution-a-timeline-of-events/.
[14]     *Id.*
[15]     *Id.*

facilities.  As a wealthy and well-known businessman in Tehran, Ghasem was perceived to be a friend and affiliate of the Shah.

34.     On July 16, 1979, the regime notified Ghasem that it had expropriated his property in Iran.  Ghasem had no opportunity to contest this expropriation.  His Iranian lawyer had simply been given a copy of a court order transferring title of his properties to entities controlled by the Iranian Government.

35.     In 1992, Ghasem returned to Iran only after he received assurances from the Iranian Government that he would not be arrested upon his re-entry into the country.  When Ghasem returned, the Iranian Government seized his passport but did not detain him.

## II.     Morad's And Vida's Life Together In The United States

36.     In 1979, Morad married Vida.  They have three children—Plaintiffs Roxanne, Tara, and Teymoor—and have been happily married for more than 44 years.  Until Morad was taken hostage in 2018, he had a very happy personal life with Vida and their children and a very successful professional life in New York and Connecticut.

37.     In the early 1980s, Morad attended business school at Columbia University ("Columbia") in New York City.  At Columbia, Morad studied real estate finance, a course of study inspired by his time at Colgate.  While at Colgate, Morad participated in a work-study program at the Institute for Architecture and Urban Studies in New York City, where he learned from trailblazers in the field of architecture such as I.M. Pei and John Hejduck.  This inspired Morad to pursue his business degree with the aim of entering the real estate industry.  Morad graduated from Columbia with an MBA in 1983.

38.     That year, Morad began working for the New York Land Company, a prominent real estate development company affiliated with landmark projects in New York City.  Morad

joined as an associate while still at Columbia, and quickly moved up the ranks of the organization, becoming a partner in or around 1987.

39.    In the early 1990's, the New York Land Company dissolved into multiple partnerships.  Morad joined one of the partnerships, known as Americas Partners, as a partner. Americas Partners continued various projects initiated by the New York Land Company and pursued other ambitious real estate investment and development opportunities.  Americas Partners' ventures included the development of America's Tower, a 50-story office building at 1177 Avenue of the Americas in New York City.  Morad was primarily responsible for the acquisition and the development of America's Tower, a project spanning 1,000,000 square feet of office space.

40.    Morad played a leading role in numerous other successful business ventures as part of Americas Partners.  For example, in or around 2003, Morad led Americas Partners' efforts to develop a $350 million casino and entertainment complex in Monticello, New York, in coordination with the St. Regis Mohawk Indian Nation.  The casino was built, owned, and operated by a publicly listed company called Empire Resorts (NASDAQ: NYNY), for which Morad served as President and board member.

41.    One of Morad's biggest business successes with Americas Partners was the turnaround and sale of Air Methods Corp. ("Air Methods"), a leading medical helicopter company. In the course of leading the company's transformation, Morad shepherded Air Methods through various management reforms and initiatives.  During this time, he served as a director on Air Methods' Board, chaired the Strategic Planning and Finance Committees, was a member of the Nominating Committee, and was the Board Member tasked with leading the sale of the company.

Under Morad's leadership, Air Methods' revenue increased roughly forty-fold and the company was ultimately sold to a private equity firm in 2017 in a $2.5 billion deal.[16]

42.    Morad's next investment project was the acquisition of approximately 600 acres of land in and around Monticello, New York, to develop housing for casino employees living in the area, and thereby capitalize on the success of Morad's earlier casino project.  Morad coordinated a group of investors who purchased the land in 2005 for approximately $7 million.  Morad personally owned a roughly 15% stake in the project at the time the land was acquired by the group.  In addition to making a large personal investment in the project, Morad also led the group's efforts to secure various required regulatory approvals and zoning and other permits.  The project was on track to succeed, but was suddenly and very unexpectedly derailed when Morad was taken hostage by Defendants in 2018.  Without Morad's leadership and expertise, the project did not proceed and ultimately collapsed.

### III.    Morad's Family Properties In Iran

43.    After years of experience and success developing real estate in the United States, Morad sought to help his father recover properties taken from the family in Iran.  The family's expropriated properties fell into three categories: (1) those held by a government-controlled foundation; (2) those sold by that foundation; or (3) those condemned to allow for future government-endorsed development projects.  Morad and his father concluded that the property that had already been sold simply could not be recovered.  Morad believed, however, that he could recover some or all the value from the properties that were either still in the possession of the government-controlled foundation or properties that had been condemned to allow for future development.

---

[16]    *Air Methods Agrees to be Taken Private in $2.5 Billion Deal*, REUTERS (Mar. 14, 2017), https://www.reuters.com/article/idUSKBN16L1H5/.

44.    To asserts their claims, Morad and his father hired counsel and obtained permission from the Iranian Government to appeal a certain expropriation order.  In that case, Iran's Supreme Court eventually ruled that the expropriation order was unjustified, in part on the ground that Morad's father, Ghasem, had been innocent of any alleged wrongdoing.  The Supreme Court sent the case down to a revolutionary court to further resolve the case.  To avoid further protracted litigation (and the appreciable risk that a revolutionary court would fabricate new charges against him), Ghasem negotiated a settlement.  For assets still in the Iranian Government's control, Ghasem, his wife, and his direct heirs were granted rights under the settlement as tenants-in-common with a government-controlled foundation, such that they became the owners of a fixed percentage (either 30 or 40 percent) of each property.  These properties had an approximate total value in excess of $200 million USD.  After the settlement was reached, the government-controlled foundation attempted to change the terms of the deal by claiming that it no longer possessed the majority of the properties, supposedly because the proprieties had been either sold or condemned. Ghasem and Morad refused to accept those terms, however, and continued to assert their ownership rights under the settlement.

45.    In or around 2000, Morad took over the effort to enforce the settlement and recover the full value of the family's interest in the supposedly condemned properties.  Morad hired Iranian counsel to investigate and identify the condemned properties.  Eventually, Morad and his counsel identified approximately 50 properties that were supposedly "condemned," but without proper legal justification.  To demonstrate that the properties should not have been condemned, Morad and his counsel hired experts to conduct technical appraisals on each property.  Then, beginning in the early 2010's, Morad brought claims in Iranian courts to obtain judgments that the condemnations had been unjustified and unlawful.

46.    Morad's legal strategy succeeded, as he was awarded judgments on specific properties by Iranian courts.  In some cases, Morad obtained orders formally placing the deeds to the properties in his name.  In other cases, courts awarded money judgments in his favor for the value of specific improperly condemned properties.  Morad managed the litigations by traveling to Iran to meet with his Iranian lawyers, attend to legal proceedings, and otherwise oversee the effort, which was succeeding until Morad was taken hostage.  Thereafter, while Morad was imprisoned, the IRGC forced him to cease his efforts to vindicate his family's rights to these properties and required him to relinquish the family's legal rights in the property.  Defendants thereby fully and completely destroyed Morad's ability to recover any of the more than $200 million in property that was taken from the family.

## IV.    Morad's Founding And Leadership Of The PWHF To Save Iranian Wildlife

47.    During Morad's trips to Iran in the early 2000's, he noticed pollution and environmental degradation in areas of the country that had been pristine and protected before the Revolution.  Morad had long been a committed conservationist and had previously donated and volunteered for conservation organizations in the United States, such as the World Wildlife Fund and various zoological societies.  Concerned with Iran's environmental degradation and threats to its wildlife, Morad decided to create a non-profit organization to help address these problems.

48.    In 2008, Morad established the PWHF as an Iranian non-governmental organization.  The Foundation's mission was to "explore and research nature, conserve the biodiversity, prevent further destruction of wildlife and its habitat, and reduce the most significant threats that threaten the survival of the Iranian people's natural heritage."[17]

---

[17]    2016/2017 Annual Report of the Persian Wildlife Heritage Foundation.

49.    Morad created the PWHF in accordance with Iranian law, through a collaboration with the United Nations Development Program ("UNDP"), the Iranian Department of Environment ("DoE"), and the Iranian Ministry of Interior ("MoI").  The areas in which the Foundation was active were also approved by the Iranian Ministry of Intelligence.  He set up the Foundation in an office space owned by his family in Tehran and began hiring staff.  To lead the Foundation, Morad appointed his friend and colleague, Kavous Seyed-Emami, an Iranian-Canadian dual national who helped found the PWHF, to serve as the organization's General Manager and Chairman of the Board.  Morad also hired the top field biologist in the country to provide scientific expertise along with geographic and regional knowledge and familiarity of Iran's flora and fauna.

50.    During this time, Morad and Vida were still living in Connecticut, where Morad was leading and managing high-value investment projects.  Given Morad's limited time and availability to help run the PWHF in Iran, Morad found other ways to support the organization from his home in the United States.  He raised money, hosted events, served on the Board, and provided high-level strategic leadership for the organization's management team.

51.    As the first organization of its kind in Iran, the PWHF quickly became extremely visible in Iran, where it coordinated its projects closely with the Iranian DoE.  Through this coordination, Morad became close with prominent Iranian environmentalists and the leadership of the DoE, including Kaveh Madani, a western-educated professor at Imperial College London who would later be appointed the Deputy Head of the DoE.

52.    Under the leadership of Morad and Kavous Seyed-Emami and in collaboration with the DoE, the PWHF launched fieldwork projects across Iran to protect at-risk species such as the Asiatic cheetah, the Asiatic black bear, and the Laristan wild sheep.  The PWHF ran projects

monitoring animal habitats, built water-related infrastructure (such as wells and water tanks) to support wildlife in regions of drought, and worked closely with the Iranian Government to develop protected areas managed by local communities through a model called Integrated Community-Based Reserves. The PWHF also undertook efforts to educate park rangers and members of other newly created conservation groups in Iran. The PWHF was also successful in raising public awareness about the endangered Asiatic cheetah by helping to place its image on the Iranian national soccer team's 2014 World Cup jerseys.[18] The Foundation's reach and impact was felt across the country and financial support for the organization was growing at the time of Morad's detention by the IRGC in 2018.

## V.    The Political Environment In Iran Leading Up To Morad's Arrest And Detention

53.    In 2013, Hassan Rouhani was allowed by the Supreme Leader to run for President of Iran and was purportedly elected by the Iranian people. President Rouhani was reportedly viewed with skepticism by the IRGC and other extremists in the Iranian Government, based in part on his reputation as a "moderate" and a "reformer." Although the United States had designated Iran a state-sponsor of terrorism, President Rouhani traveled to the United States to speak at the United Nations during his tenure as President of Iran.[19]

54.    At this same time, the IRGC's Intelligence Organization—the intelligence agency within the IRGC—was led by Hossein Taeb.[20] The IRGC Intelligence Organization was set up in

---

[18]    Trudy Rubin, *Iran's shame: How saving cheetahs got environmentalists 10-year sentences in Tehran*, SEATTLE TIMES (Feb. 20, 2020), https://www.seattletimes.com/opinion/irans-shame-how-saving-cheetahs-got-environmentalists-10-year-sentences-in-tehran/.

[19]    *See, e.g.*, Hossein Bastani, *How Powerful is Rouhani in the Islamic Republic?* 2, 5-12 (Chatham House Rsch. Paper 2014), https://www.chathamhouse.org/sites/default/files/field/field_document/20141124Rouhaniislamic RepublicBastani.pdf.

[20]    Udit Banerjea, *Revolutionary Intelligence: The Expanding Intelligence Role of the Iranian Revolutionary Guard Corps*, 8 J. OF STRATEGIC SEC. 3, 96-98, 100 (2015).

2009 amid protests known as the "Green Revolution," which occurred in response to perceived election fraud that resulted in former President Mahmoud Ahmadinejad's second term in office.[21] Fearing that the protests could lead to a coup or some form of systematic defiance, the IRGC set up an independent intelligence apparatus on the orders of Iran's Supreme Leader, Ayatollah Khamenei, who appointed Taeb as its director.[22]  Taeb was an ultra-conservative force in the Iranian Government, and harbored suspicions of the Rouhani-led part of the Government, especially those in the Government with any affiliations with the United States, or the "West" more broadly.[23]

55.    In August 2013, the newly elected President Rouhani called for Iran to resume serious negotiations with China, France, Russia, the United Kingdom, and the United States—the permanent members of the U.N. Security Council—along with Germany (together, the "P5+1") over Iran's nuclear program.  Nuclear negotiations among the P5+1 and Iran intensified over the following year.[24]

56.    The nuclear negotiations among Iran and the P5+1 caused significant tension between the IRGC and President Rouhani's supposedly more moderate administration.[25]  High-level IRGC officials criticized and sought to undermine the Rouhani administration's efforts to

---

[21]    *Id.*

[22]    *Id.*

[23]    *Id.*

[24]    *Timeline of Nuclear Diplomacy with Iran, 1967-2023*, ARMS CONTROL ASS'N, http://www.armscontrol.org/factsheet/Timeline-of-Nuclear-Diplomacy-With-Iran (last updated Aug. 2016); *see also* Kenneth Katzman, Cong. Rsch. Serv., RS20871, *Iran Sanctions* 5-6 (2022), https://www.fas.org/sgp/crs/mideast/RS20871.pdf.

[25]    President Rouhani's electoral victory in 2013 was opposed by Iran's hardline factions. Although President Rouhani's election was welcomed by some as a sign of modest progress toward reform and potential partial reconciliation with the West, President Rouhani's authority remained subject to the authority of the Supreme Leader.  *See e.g.*, Bastani, *supra* n.19.

engage with the United States and other Western powers over Iran's nuclear program.[26]  For example, IRGC-controlled media portrayed foreign minister Javad Zarif, appointed by President Rouhani in 2013, as "not a real revolutionary, pointing out that he was pursuing a doctorate at the University of Denver when the IRGC's current leaders were in the trenches fighting Saddam" in the Iran-Iraq War in the 1980's.  IRGC outlets further criticized "Bijan Zangeneh, Rouhani's oil minister, for trying to bring Western investment into Iran's ailing oil and gas sector."[27]

57.    Tensions in Iran worsened in 2015, when President Rouhani's administration and the P5 + 1 reached agreement on a plan to dismantle much of Iran's nuclear program and open its facilities to more extensive international inspections—an agreement known as the Joint Comprehensive Plan of Action ("JCPOA").[28]  In return for dismantling its nuclear program, Iran was to be granted various concessions, including billions of dollars' worth of sanctions relief.  The IRGC opposed the JCPOA, viewing it as a capitulation to the United States and other Western powers and voicing concerns about Western "infiltration" and "soft subversion."[29]

58.    Tensions between IRGC hardliners and the Rouhani government continued following ratification of the JCPOA in 2015, as the IRGC further sought to undermine the legitimacy of President Rouhani.  The IRGC was delivered a political blow in May 2017, however, when President Rouhani won a second term in a purported election landslide, running in part on a platform of engagement with the world—including the West and Iran's Gulf Arab neighbors—and

---

[26]    *E.g.*, Marcus George, *Iran: Hardline Anxiety Over Rouhani Grows More Acute*, BBC (May 11, 2014), http://www.bbc.com/news/world-middle-east-27337623.

[27]    Alex Vatanka et al., *How Deep Is Iran's State?*, FOREIGN AFFS. (June 13, 2017), https://www.foreignaffairs.com/articles/iran/2017-06-13/how-deep-irans-state.

[28]    *See* Kali Robinson, *What is the Iran Nuclear Deal*, COUNCIL ON FOREIGN RELS. (Oct. 27, 2023), https://www.cfr.org/backgrounder/what-iran-nuclear-deal#chapter-title-0-11.

[29]    *E.g.*, Maysam Behravesh, *Iran's Spies Are at War With Each Other*, FOREIGN POLICY (Aug. 19, 2019), https://foreignpolicy.com/2019/08/09/irans-spies-are-at-war-with-each-other/.

domestic social, political, and economic reforms.  The hardline candidate, Ibrahim Raesi, ran on a populist and isolationist platform and supposedly lost the purported election by a large margin.[30] The election only exacerbated the tensions between the hardline faction in the Iranian Government and the Rouhani administration.[31]

59.    By late 2017, when Morad was first arrested and detained, tensions between IRGC hardliners and the Rouhani government had reached a boiling point.  In December, President Rouhani leaked a sensitive government budget document showing that billions of dollars were going to line the pockets of hardline organizations, the military, and the IRGC, while budgets were cut for programs benefitting the poor and middle class.[32]  In response, in an attempt to embarrass and undermine President Rouhani, the IRGC and other Iranian hardliners staged a demonstration in Mashhad—a city dominated by extremist supporters of Ibrahim Raesi—where protestors condemned the economic situation in Iran, chanting "Death to Rouhani."[33]

60.    The protests quickly grew and turned against the Islamist establishment.[34]  As demonstrations spread across the country, protesters' grievances expanded beyond economic issues and dissatisfaction with President Rouhani to include political opposition to Iran's theocratic

---

[30]    Ariane M. Tabatabai, *Iran After the Election: Rouhani Battles the Shadow Government*, FOREIGN AFFS. (May 26, 2017), https://www.foreignaffairs.com/articles/iran/2017-05-26/iran-after-election.

[31]    *Id.*; Maryam Sinaiee, *IRGC Official Discloses Details Of Confrontation With Rouhani*, IRAN INT'L (Jan. 12, 2022), https://www.iranintl.com/en/202201127681.

[32]    Thomas Erdbrink, *Hard-Liners and Reformers Tapped Iranians' Ire. Now, Both Are Protest Targets*, N.Y. TIMES (Jan. 2, 2018), https://www.nytimes.com/2018/01/02/world/middleeast/iran-protests-khamenei.html?searchResultPosition=5.

[33]    Thomas Erdbrink, *Scattered Protests Erupt in Iran Over Economic Woes*, N.Y. TIMES (Dec. 29, 2017), https://www.nytimes.com/2017/12/29/world/middleeast/scattered-protests-erupt-in-iran-over-economic-woes.html.

[34]    Thomas Erdbrink, *In Iran, Environmentalists Are Now Seen as Spies*, N.Y. TIMES (Feb. 12, 2018), https://www.nytimes.com/2018/02/12/world/middleeast/iran-environmentalists-spies.html?searchResultPosition=1.

regime and Ayatollah Khamenei.  Ayatollah Khamenei and the IRGC blamed foreign and domestic enemies for the protests.[35]  The Rouhani government and the IRGC disagreed on the appropriate handling of protestors, as President Rouhani defended the right to peaceful protest and publicly questioned IRGC narratives about protesters who had allegedly committed suicide while detained.[36]

61.     In addition to generalized economic resentment, environmental issues had also become a focus for protestors and thus were an additional point of friction between the IRGC and the Rouhani administration.[37]  The IRGC viewed the DoE as corrupt and "westernized," as evidenced by the fact that DOE leaders, including Vice President and Head of the Department of Environment Issa Kalantari and Deputy Head of the Environment Kaveh Madani, had both been educated in the United States and recruited by President Rouhani to return to Iran.[38]  The PWHF leaders' ties to the United States and Canada, and the PWHF's collaboration with the DoE, made Morad and his PWHF colleagues a political target of the IRGC and other hardliners.  It was not long before Morad and his PWHF colleagues were caught in the crosshairs of the IRGC's subversive political efforts to turn the public against President Rouhani and officials in his

---

[35]     Asa Fitch, *Iran's Guard Declares Victory Over Protesters, but Signs of Dissent Remain*, WALL STREET J. (Jan. 7, 2018), https://www.wsj.com/articles/iranian-protesters-burn-identification-cards-after-security-crackdown-on-streets-1515331766.

[36]     Thomas Erdbrink, *In Iran, Protester 'Suicides' Stir Anger and Calls for Accountability*, N.Y. TIMES (Jan. 14, 2018), https://www.nytimes.com/2018/01/14/world/middleeast/iran-protests-deaths.html.

[37]     Shashank Bengali & Ramin Mostaghim, *Environmentalists are the latest targets for arrest in Iran*, L.A. TIMES (Feb. 12, 2018), https://www.latimes.com/world/middleeast/la-fg-iran-environment-arrests-20180212-story.html.

[38]     Thomas Erdbrink, *In Iran, Environmentalists Are Now Seen as Spies*, N.Y. TIMES (Feb. 12, 2018), https://www.nytimes.com/2018/02/12/world/middleeast/iran-environmentalists-spies.html?searchResultPosition=1; Saeed Kamali Dehghan, *Top scientist leaves Iran after crackdown on environmentalists*, GUARDIAN (Apr. 18, 2018), https://www.theguardian.com/environment/2018/apr/18/kaveh-madani-scientist-leaves-iran-after-crackdown-environmentalists.

administration such as DoE Deputy Minister Madani, whom the IRGC sought to portray as puppets of the United States and its Western allies.

## VI.    The IRGC's First Detention And Interrogation Of Morad

62.    In October 2017, Morad traveled to Tehran with Vida to visit family, meet with the PWHF team, and continue pursuing claims relating to his family's properties. Morad and Vida planned to return to the United States right before Thanksgiving, along with their daughter Tara, who had joined them in Iran.

63.    Defendants first confronted Morad on November 16, 2017. On the morning of November 16, Morad, Vida, and Tara traveled to Imam Khomeini International Airport ("IKA Airport" or "IKA") for their flight through London to the United States. After they had checked in, they proceeded to customs, where Tara and Vida were cleared without issue. When Morad gave his passport to the Iranian customs officials, however, he was pulled aside and told he could not leave. Morad was taken to an interrogation room in the airport, where he remained for six hours. Tara and Vida were told they could proceed to their flight, but they refused to do so because they did not want to leave Morad behind. Morad's interrogators eventually released him, but held his passport and told him he would have to meet with other government agents before he could leave the country. Morad left the airport with Vida and Tara and together they returned to his in-laws' home in Tehran.

64.    Within a few hours of arriving back at his in-laws' home in Tehran, Morad received a call from an unknown number instructing him to report to an IRGC Intelligence safehouse called "Saboonchi." Morad traveled to this safehouse along with Houman Jowkar, a senior leader in the PWHF who was with Morad when he received the call instructing him to come to Saboonchi.

65.    Upon arriving at the safehouse, Morad and Houman were taken into separate rooms for questioning by IRGC Intelligence officers. Morad was asked questions related to the work of

the PWHF, including the scope of the organization's work and its geographic reach in the country. The interrogators told Morad he would be able to retrieve his passport the next day at the Passport Administration Office in Tehran.

66.    Morad was able to successfully retrieve his passport, and he booked the first available flight to London for himself and Vida, leaving several days later. Tara was able to book a flight that left Tehran the next day, on November 18. She successfully boarded the flight and flew to London on November 18. At that point, Tara planned to meet her parents in London before returning to the United States, but that plan fell through when Morad and Vida were detained and prevented from leaving Iran. Tara eventually flew back to the United States by herself; it would be nearly six years before she would see her parents again.

## VII.    Defendants' Hostage Taking Of Morad And House Arrest Of Vida

67.    On the morning of November 22, 2017, Morad and Vida returned to IKA Airport for their flight to London. Defendants seized Morad's passport and detained him in an interrogation room while his luggage was removed from the flight. Vida would not leave without him and hoped he would soon be released.

68.    This time, authorities told Morad he would have to go to Court 33 to retrieve his passport. Court 33 is located within Iran's infamous Evin Prison. Morad was familiar with Evin Prison because it is a notoriously brutal prison where political prisoners, dissidents, and hostages are sent for torture, interrogation, solitary confinement, and long-term imprisonment. Morad opted not to go to Court 33 to retrieve his passport for fear he would be detained there. Instead, he returned with Vida to her parents' home in Tehran.

69.    After Morad's passport was seized, Morad and Vida waited roughly six weeks until Morad was contacted by IRGC officials. During this time, Morad and Vida had no idea why the government had seized Morad's passport or what would happen to them as a result of the passport

seizure and Defendants' refusal to allow Morad to leave Iran. Morad was informed by high-level contacts in the Iranian Government that the IRGC had become suspicious of him because of his U.S. (and U.K.) citizenship and the work of the PWHF, including its ties to the DoE, the United States, and the "West." During this time, Morad and Vida were followed and surveilled by agents of Defendants, who made little effort to hide the fact that they were watching.

70.     On January 9, 2018, Morad was called back by the IRGC to its Saboonchi safehouse for a second interrogation. At Saboonchi, he was questioned by IRGC Intelligence officers about the activities of the PWHF and his work in Iran. His PWHF colleague, Houman, was interrogated in a separate room at the same time. Morad was then allowed to return to Vida's parent's home in Tehran and told to prepare slideshows of the PWHF's work to present to the IRGC.

71.     On January 10, 2018, the IRGC demanded that Morad report to Saboonchi for a third interrogation. At Saboonchi, his IRGC interrogators told him that this would be the last session and that he would be free to leave Iran after it concluded. However, the IRGC interrogators became violent and confrontational during their interrogation of Morad. At the conclusion of the interrogation, IRGC officers slammed Morad against the wall, forced him to take off his belt, shackled his wrists, and blindfolded him. At this point, IRGC agents shoved Morad into a vehicle filled with armed IRGC guards who grabbed him forcefully by the neck and yanked him into the car. Morad was still blindfolded as the car drove to Evin Prison, where Morad would be held by Defendants for the next five-and-three-quarters years, until his release in September 2023. During the ride, Morad was repeatedly shocked and prodded with electrically charged devices wielded by the IRGC guards in the vehicle.

72.     Shortly thereafter, on January 24, 2018, the IRGC demanded that all Tehran-based PWHF employees report to the Foundation's headquarters. At that point, all employees based in

Tehran were arrested by the IRGC. Two days later, Morad's co-founder, Kavous Seyed-Emami, was violently arrested by the IRGC. The IRGC conducted further arrests that went beyond the Foundation's core employees and eventually included field staffers and game wardens. Some individuals swept up in the politically motivated arrests had no *bona fide* connections with the Foundation at all; one of the men arrested, for example, had just leased his apartment to a PWHF employee while he worked on a field study. In total, between January and February 2018, the IRGC arrested 55 people allegedly tied to the PWHF.

73.     On the same day Morad was taken to Evin Prison (January 10, 2018), Vida was sent a message from Morad's phone "inviting" her for lunch at the IRGC safehouse at 1:00 pm. Once she arrived, she was ushered into a backroom and met by a mullah who told her that Morad was a traitor and a spy for the United States and Israel and that, accordingly, he had been taken to Evin Prison. The mullah began interrogating Vida by yelling questions at her, violently banging on the table, and threatening to send her to Evin Prison if she did not "cooperate" by confessing that her husband was a spy. As the interrogation continued, the mullah got angrier and more violent. When he noticed Vida's ankle showing above her sock, he threatened to cut off her legs if she did not cooperate. After IRGC agents confiscated Vida's phone, they forced into a car filled with other armed IRGC agents and told her she was being taken to Evin Prison. Vida feared for her life and believed she too was about to be imprisoned. Instead, IRGC agents took her to her parents' home in Tehran and told her she could not leave Iran.

74.     When she arrived at her parents' home, Vida noticed between eight and ten men waiting outside. The men walked her up the building stairs to the apartment. When she walked in, Vida's elderly mother was petrified. She was worried sick about her daughter's unusually long absence. She had been frantically trying to contact Vida, calling her repeatedly and getting no

answer.  Upon seeing her mother in distress and with the knowledge that her husband was detained in Evin Prison, Vida broke down in her mother's arms crying while IRGC agents searched and surveilled the apartment and surrounding area.

75.    That same day, in front of Vida and Vida's elderly parents, IRGC agents spent hours ransacking Vida's parents' apartment where Morad and Vida had been staying.  They took 13 garbage bags of documents, everything in Morad's drawers, two of his legally owned firearms, and a safe.  The entire time the agents kept demanding Morad's non-existent Israeli passport and intimidating Vida and her parents.

76.    For the 10 days following this traumatic arrest and ordeal, Morad was held completely *in communicado*.  Vida received no word from Morad and had no idea where or why he was being held.  Without any information about her imprisoned husband, Vida was so distraught she was unable to leave her bed.  Defendants also seized Vida's passport and prohibited her from leaving Iran.  During the time that Morad was unlawfully imprisoned by Defendants, Vida was constantly being surveilled and watched, and she was fearful that she could also be wrongfully imprisoned at any moment.

## VIII.    Defendants' Years-Long Imprisonment Of Morad As A Hostage

77.    On January 10, 2018, the IRGC took Morad from Saboonchi to the Evin Detention Center inside Evin Prison in Tehran.  Evin Prison detainees, many of whom are hostages and political prisoners, are routinely tortured, abused, and subjected to severe physical mistreatment and psychological terror.    IRGC interrogators at Evin Prison use harsh and relentless interrogations, threats of violence and execution, prolonged periods of solitary confinement, and

other cruel, degrading, and inhumane treatment to terrorize and torture their subjects.[39]  This pattern and practice of egregious and unlawful misconduct is well known and has formed the basis of numerous U.S. court judgments against Iran and the IRGC for precisely the same type of terrorism, torture, and hostage taking that occurred in this case, as described in more detail below.

78.    Upon arrival at Evin Prison, the IRGC sent Morad to "Ward 2A," which the IRGC controls and operates in a notoriously brutal and inhumane manner designed to terrorize inmates.[40] The IRGC agents strip-searched Morad, confiscated his clothes and personal effects, and made him wear prison clothes.  They then led him to a concrete cell where he was held *in communicado* in solitary confinement for days on end.

79.    Morad was kept in these cruel conditions in solitary confinement in Ward 2A for 70 days.  For the first several weeks, from approximately January 12 to February 8, 2018, Morad was isolated in a cell that was roughly eight by ten feet, with nothing but a hole in the ground for a toilet.  From February 8 through March 21, 2018, he was held in a tiny concrete cell measuring just six feet by eight feet.  Morad could reach out and touch opposing walls.  There was no outside light, no bed, and no toilet.  Morad slept directly on the cold concrete floor with nothing but a dirty, threadbare blanket.

80.    During the entire time he was in solitary confinement, Morad was held *in communicado*.  He was prohibited from communicating with his wife, mother, children, or anyone else.  He was allowed only a brief visit with Vida on March 21, 2018—the Iranian new year—

---

[39]      *See* Perry Chiaramonte, *Hell on Earth:  Inside Iran's Brutal Evin Prison*, FOX NEWS (Jan. 28, 2013), http://www.foxnews.com/world/2013/01/28/inside-evin-look-at-world-most-notorious-political-prison.html.
[40]      *See* Jason Rezaian, *What is Iran's Evin Prison like? These letters show the terrifying reality*, WASH. POST (Jan. 24, 2020), https://www.washingtonpost.com/opinions/2020/01/24/10-letters-smuggled-out-irans-evin-prison-describe-systematic-denial-rights-also-hope/.

when Vida had gone to the prison without an appointment, hoping that the guards would take pity on her and let her see her husband because of the holiday. After the guards invasively strip-searched Vida, they let her briefly see Morad. When she first laid eyes on him, she barely recognized him and was shocked to tears. His eyes were full of blood and his body was pale and gaunt. He had lost 65 pounds in less than two months; his overall health and state of mind had rapidly deteriorated without proper food, living conditions, and medical care.

81.    Throughout Morad's time in Ward 2A, Defendants deprived him of the most basic human needs and subjected him to psychological torture and physical cruelty. Bright lights glared in his cell 24 hours a day. The bright light, combined with the loud rattle of some kind of fan outside his cell kept him from sleeping. Morad was constantly on edge, as his interrogators harassed and abused him and he could hear the disturbing cries and screams of other prisoners. Morad remembers hearing the effects of torture and brutality in neighboring cells. At one point, a prisoner in a nearby cell was so deeply tormented by the conditions that he repeatedly slammed his own head into the wall of his cell with such force that his head apparently broke open and Morad could hear his screams. Morad deduced that the floor above him housed female prisoners as the crying and screaming coming from the ceiling differed in pitch from the crying and screaming he heard on his floor.

82.    While in solitary confinement, Morad suffered from extreme anxiety, depression, and hallucinations, such as perceiving non-existent figures and shapes on the concrete walls of his cell. During this time, he was subjected to frequent interrogations and sometimes multiple interrogations in the same day. Defendants' agents frequently and relentlessly abused him in unending interrogations with violent and abusive interrogation methods, including beating Morad and threatening him and his family with death, violence, and dismemberment.

83.    On March 21, 2018, after 70 days in solitary confinement, Morad was moved to a small two-person cell, also in Ward 2A, where the conditions were equally deplorable.  His first cellmate was a member of the terrorist organization, the Islamic State of Iraq and Syria ("ISIS"), who was accused of killing an IRGC official.  Morad feared for his life.  So acute was the sense of danger that Morad could not safely fall asleep.  Although the cell was already too small for two cellmates, Defendants forced a third cellmate (another follower of ISIS) into Morad's cell.  This individual was so distressed that he attempted to kill himself with the slats from an air vent, injuring himself and soaking the walls and floor of the cell in blood in the process.  The prisoner was taken away but returned a few days later.  Morad could not safely sleep and "kept one eye open," for fear he would be harmed or killed while he slept.  Morad had virtually no contact with the outside world.  He was allowed only one two-minute call per week for the entire time he was incarcerated in Ward 2A.  The calls were monitored, and he was allowed to discuss only certain topics, such as the family's health.

84.    In November 2018, Morad was sent back to solitary confinement and held *in communicado* in cruel conditions for another 20 days.  During this time, Morad was kept in a cell approximately six feet by ten feet, which contained only a small sink and a dirty hole in the ground for a toilet.  Morad had difficulty sleeping on the cold concrete floor with glaring lights and a loud nearby noise rattling 24 hours a day.

85.    After 20 days in solitary confinement, Morad was moved into a large group cell in Ward 2A.  The cell included other affiliates of the PWHF, but also other prisoners, including members of ISIS.  The cell was built for only a few prisoners but the IRGC filled it with as many as 13 prisoners while Morad was held there in overcrowded and squalid conditions.  The only way to access the hole in the ground that served as the community toilet was to step on or over other

prisoners.  Sleep was made difficult by the noise and habits of the other prisoners.  Apart from sometimes lengthy relocations for interrogations or trips to the Revolutionary Court, Morad was held in this cell until roughly March 2019.

86.    The only time Morad was allowed out of the group cell in Ward 2A was for interrogations or for a 15-minute blindfolded walk in the "yard," which was permitted just twice a day, once in the morning and once in the evening.  During these walks, Morad wore only prison-issued flip flops and pajamas, even in the winter when the temperatures were freezing.  During the fifteen minutes in the yard, Defendants closely guarded Morad and kept him blindfolded at all times.

87.    Morad received minimal food and water for most of his five-and-three-quarters years in prison.  The situation was particularly bad during the first 70 days that he was held in solitary confinement:  While other prisoners were permitted to have their own water bottles, Morad was not allowed access to water during that time except when he requested it from his captors, who often withheld it from him.  Moreover, during that period, Morad was only permitted to shower every three days in the presence of a guard, and then only for a few minutes before the guard would force him to return to his cell.

## IX.    Defendants' Interrogations And Torture Of Morad At Evin Prison

88.    Defendants' interrogations of Morad were aggressive, brutal, and inhumane—hallmarks of the Iranian regime.[41]  The interrogations commenced when Morad was taken to Evin Prison and continued with near-daily frequency (and sometimes several times a day) until 2019.

---

[41]    U.S. Dep't of State, *2023 Country Reports on Human Rights Practices: Iran*, https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/iran/ (last visited Sept. 9, 2024).

89.     Defendants' agents frequently interrogated Morad multiple times a day and at all hours of the night.  Although prohibited by Iranian law, interrogations in the middle of the night were used to disorient and terrorize Morad.  Defendants' interrogators often stormed Morad's cell in the middle of the night to interrupt any sleep and produce the maximum level of anxiety and fear in Morad.  This conduct kept Morad on edge, making it impossible to sleep regularly or soundly.  During interrogations, Morad was blindfolded and taken to different rooms where his interrogators assaulted, bullied, and aggressively questioned him for hours at a time.  IRGC interrogators terrorized Morad with days, weeks, and months of violent interrogations that involved yelling, shoving, hitting, and threats of killing and dismemberment of Morad and his family.

90.     Although IRGC interrogators knew that Morad was innocent and had committed no crime, they often used violent tactics in an attempt to coerce Morad to confess to their false and outrageous accusations of spying and espionage.  While Morad stood blindfolded and surrounded, IRGC interrogators would slam the walls, punch him in the face and head, hit him in the stomach, and otherwise subject him to physical assaults and abuse.  During one especially brutal interrogation, approximately three months after he was imprisoned, his interrogators became angry with Morad's answers and tone of voice.  They forced Morad out of the interrogation room and into a stairwell where one of the guards smashed the left side of his head.  Following that assault, the guards hauled him back into the interrogation room where they continued their interrogation.  As a result of the impact to his head, however, Morad could not hear through his left ear.  He suffered permanent hearing loss, which he never recovered.  After complaining to guards for many months about the damage to his ear and hearing loss, he finally received a hearing test in or around October 2019.  The test confirmed loss of hearing in the left ear, but the results were destroyed by

an IRGC interrogator.  As a result of the hearing loss, Morad now uses a hearing aid but still cannot hear well from his left ear.  In another brutal assault, Morad's interrogators took him blindfolded into a concrete stairwell and shoved him down an entire flight of stairs, knowing it could kill him. Morad fell and bounced on the concrete stairs, resulting in serious contusions and pain that lasted for days.  It was only through sheer luck that he avoided any broken bones or more serious injuries to his head from the violent shove and resulting fall down concrete stairs.

91.     Defendants also employed psychological torture, using lies and threats to make Morad fear for his and his family's lives and well-being.  Defendants used these tactics to terrorize Morad and also to attempt to coerce him into giving false confessions.  In one instance, Morad's captors tied him to a bedframe and told him that certain mullahs had approved beating and lashing him with a cable.  While being held in extreme tension, the interrogators would scream at him and make noise with a whip-like cable, but instead of striking him with the cable, they eventually untied him and viciously beat him.  Other threats included injecting Morad with a syringe full of air (which can be fatal), injecting him with so-called "truth serum," and attaching jumper cables to his body and threatening to electrocute him.  Morad was frequently threatened with execution and shown photographs of his family, while being told they would be maimed or killed unless he confessed to the so-called "crimes" that the IRGC said he had committed.  In one particularly traumatic instance, an IRGC interrogator told Morad that they knew where his daughter Tara lived and that she could be hit by a car at any time.  At the same time that Morad was receiving threats regarding his family's safety, Tara often felt she was being followed in New York City where she lived.

92.     In another particularly traumatic moment, Morad was shown an image of the dead body of his PWHF co-founder, Kavous Seyed-Emami, and was told he would face the same fate

if he did not confess. Kavous had been arrested, along with the eight other "headquarters" employees of the PWHF, shortly after Morad's detention. Only a few weeks after being taken prisoner by the IRGC, Kavous had died (or, more likely, been murdered during interrogations) in a neighboring cell in Evin Prison. Morad learned of his friend's death sometime in February 2018 during a late-night interrogation by eight IRGC agents, including a high-ranking intelligence official. During that interrogation, Morad was shown a video on a tablet where Kavous's wife and brother were walking around a metal coroner's table on which Kavous's dead body had been laid out. The video clip showed that Kavous was dead, and that his wife and brother had come to Evin Prison to identify the body. The IRGC Intelligence officials suggested that Kavous was killed for being non-cooperative with interrogators and told Morad that they would do the same thing to him if he failed to confess and give them information. Kavous's death was reported in Iranian media as a suicide, a claim belied by the circumstances, including the statements and threats of Morad's interrogators. Human rights organizations have called the claim of suicide "highly questionable."[42]

93.    In early 2019, Morad was briefly relocated out of Evin Prison to a building run by IRGC Counterintelligence ("COIN") officials, known as Facility 59. Morad was interrogated at Facility 59 over two days before being returned to Evin Prison. While at Facility 59, he was treated very differently than he was treated by interrogators in Ward 2A at Evin Prison. He was asked detailed questions about the PWHF's work and was even given access to media that he had requested, such as newspapers and television. Still, over the course of two days, Morad was interrogated for roughly 15-18 hours, and was recorded by multiple video cameras the entire time. At the end of the interviews, he was able to call his wife Vida.

---

[42]    *Iranian-Canadian's death in Iran prison 'highly questionable,' prompts calls for Canada to act*, CBC NEWS (Feb. 11, 2018), https://www.cbc.ca/news/canada/kavous-seyed-emami-iran-prison-death-suicide-canada-environment-1.4531002.

94.     Morad was later told by Iranian contacts that the interview with COIN officers resulted in a report being sent to the Supreme Leader concluding that there was no justification to give Morad the death penalty, but he had to be punished so that the IRGC would not be embarrassed politically.  Nearly all the jailed PWHF personnel went through a similar process.

## X.    Morad's Injuries And Severe Health Problems

95.     In addition to suffering prolonged physical abuse and mental torture, and cruel, inhuman, and degrading treatment, Morad endured repeated denials of his requests for medical care.  Nearly two decades ago, in 2006, Morad had cancer of the prostate that required surgery.  As a result of scarring from his cancer and surgery, he has permanent urethral strictures.  The scarring and strictures require the use of a catheter at least once a month to prevent painful blockages, narrowing, or closing of the urethra.[43]  He also requires regular screenings for potential recurrence of prostate cancer.  Officials at Evin Prison were aware of these medical needs, but refused to provide Morad a catheter and denied him screenings and other basic medical care.

96.     Deprived of a catheter, Morad suffered painful blockages and narrowing of his urethra that impeded urination.  As the strictures worsened, Morad was unable to properly urinate. When the strictures became so severe that no urine could pass at all, Morad would suffer extreme pain and become delirious.  During his detention, Morad had to be rushed to the emergency room in the prison multiple times to relieve the urethral strictures that would build up in his body. Horrifically, he was chained to the bed before and after these operations.  At times, Morad stopped drinking water for fear he would not be able to urinate, which caused him to become severely dehydrated.  The dangerous combination of dehydration and excess urine harmed Morad's kidneys, which could not properly filter and remove toxins from his body.  Because Morad was

---

[43]     Self-catheterization is a straightforward process that involves inserting a thin, hollow tube into the bladder through the urethra.  It requires only a sterile catheter.

both not drinking enough water and was restricted in his ability to pass urine, his kidneys could not function properly, and his health deteriorated. As a result, Morad also developed painful urinary tract infections. To combat these repeated infections, he had to take Ciprofloxacin, an antibiotic that caused substantial gastrointestinal problems and compounded the harmful effects of inadequate food and water.

97.    Prior to his imprisonment and approximately two years after his bout with prostate cancer, Morad also had carcinoid cancer on his appendix, which had been surgically removed in 2008. Since then, Morad has required annual testing for carcinoid cancer. The doctor in Evin Prison was unfamiliar with carcinoid cancer and declined to conduct the required testing. Eventually, after persistent demands, Morad was allowed to receive testing outside the prison. Testing conducted outside the prison in March 2019 resulted in a misdiagnosis, as local doctors mistakenly concluded that Morad had carcinoid cancer throughout his body, including his eyes, kidney, and pancreas. Following further tests, including various biopsies, a colonoscopy, and an endoscopy in April 2019, the misdiagnosis was confirmed by local doctors who concluded that Morad needed chemotherapy. Thereafter, Morad received four chemotherapy treatments over a period of roughly four months, while imprisoned at Evin Prison. Eventually, after intensive demands by Vida, Moard's test results were provided to his family physician in Connecticut, who determined that the tests results had been misread and that false positives had resulted from the medication Morad had been given by doctors in Evin Prison. At this point, Morad had already suffered through four chemotherapy sessions, forcing him to endure these toxic treatments for no medical reason other than a mistaken diagnosis. Even during this difficult time, Defendants continued to abuse and mistreat Morad, including interrogating him during chemotherapy treatments while he had an IV in his arm.

98.     Today, as a result of years of mistreatment and denial of proper medical care for the five-and-three-quarters years that he was held hostage by Defendants, Morad still suffers from various physical and mental health problems.  For example, he must use a catheter far more frequently than he had before his detention—at least once a week—in order to alleviate strictures in his urethra and enable urination.  This has had a significant, negative impact on his quality of life, as it can be painful and requires regular monitoring and attention.  Morad also suffers from more frequent urinary tract infections that require antibiotics, including heavy doses of Ciprofloxacin, which has caused significant gastrointestinal discomfort and other side effects.

99.     Additionally, due to years of sleeping on a concrete floor, Morad suffers from bursitis in his hips.  The bursitis has persisted despite physical therapy and a cortisone injection following Morad's return to the United States in September 2023.  The result is that Morad is often able to sleep only an hour at a time due to the severe pain.  The lack of sleep, coupled with the trauma of his imprisonment and other health complications, leaves him feeling frequently depressed, exhausted, and unable to engage in much physical activity.

100.    While he was held hostage, Morad was also frequently very sick with COVID-19, for which he never received proper medical treatment.  From 2020 through 2023, Morad was infected with COVID-19 at least six times.  The first case was particularly severe, as Morad was very sick for weeks without receiving any medical attention.  During the initial COVID-19 outbreak in early 2020, Iranian officials downplayed the severity of the COVID outbreaks in prisons and failed to take even basic precautions to prevent the spread of this serious disease.[44] Prisoners were not provided with vaccines, masks, sanitizer, or other personal protective

---

[44]     *Iran: Leaked official letters reveal state denial of COVID-19 crisis in prisons*, AMNESTY INT'L (July 31, 2020), https://www.amnesty.org/en/latest/news/2020/07/iran-leaked-letters-reveal-state-denial-of-covid19-crisis-in-prisons/.

equipment.  Prisoners who became infected with (and exhibited the worst symptoms of) COVID-19 were taken to a prison quarantine facility where overcrowding led to even more hideous conditions and, in some cases, death.  To avoid such dire conditions and consequences, sick prisoners made every effort to hide their symptoms, which led to further spread and exacerbated the health crisis in the prison.

101.    Throughout his detention, Morad suffered from sickness, weight loss, and malnutrition.  In 2022, he was subjected to a series of diagnostic tests and found to have a serious liver disorder, likely due to the harsh conditions and inadequate prison food he had been given for the previous four and a half years.

102.    As a result of stress, malnutrition, and the cumulative effect of his mistreatment, Morad rapidly lost a dramatic amount of weight—more than 60 pounds—while imprisoned.  He also suffered from severe digestive discomfort and intestinal issues that went untreated.

103.    Morad was also not permitted any dental examinations or treatments for the majority of his detention.  As a result, he developed numerous cavities that had to be treated and filled following his eventual release from Evin Prison.

## XI.    Defendants' Admissions That They Had No Basis To Arrest And Detain Morad

104.    In 2018, Iranian President Rouhani convened an official commission (the "Rouhani Commission") to investigate whether, as the IRGC had alleged, Morad and his PWHF colleagues had engaged in spying and espionage against the Iranian state.  The Rouhani Commission included several cabinet-level ministers from the Iranian National Security Council, including the Minister of Justice, Minister of the Interior, Minister of Intelligence, and Legal Vice President.  After several months, the Rouhani Commission publicly announced its conclusion that there was no basis to continue holding Morad or his PWHF colleagues and, therefore, that they should be released immediately.

105.    Defendants nonetheless refused to release Morad and instead held him hostage for *five more years*.  Defendants' hostage taking was so outrageous and wrongful that it prompted public expressions of dissent, even from Iranian officials—a rare occurrence given the authoritarian control wielded by the Supreme Leader Ayatollah Ali Khamenei, with the help of the IRGC, over all parts of the Iranian state.

106.    For example, in April 2018, a member of the Islamic Consultative Assembly of Iran ("ICA Member"), Mahmoud Sadeghi, wrote an open letter of dissent to the head of the IRGC's intelligence wing, Hossein Taeb, about Morad and other imprisoned environmentalists.  In that letter, ICA Member Sadeghi accused the IRGC of "violat[ing] the legal rights of the defendants who, three months into their detention, are deprived of access to lawyers or meeting up with their families."[45]  On May 8, 2018, ICA Member Sadeghi tweeted that the "Intelligence Ministry's counter-intelligence experts 'had found no evidence at all of their [the environmentalists' alleged] ties to espionage.'"[46]

107.    Other Iranian officials echoed this sentiment.  In May 2018, former Vice President Isa Kalantari, the then-head of the Department of Environment, announced that the investigation by the Rouhani Commission did not find any evidence of espionage by Morad or other PWHF personnel.[47]  At a press conference, Kalantari highlighted the Rouhani Commission's findings,

---

[45]    AFP, *Iran MP slams Revolutionary Guards' treatment of environmentalists*, TIMES OF ISRAEL (Apr. 21, 2018), https://www.timesofisrael.com/iran-mp-slams-revolutionary-guards-treatment-of-environmentalists/.

[46]    *Iranian VP Refutes Espionage Claims Against Detained Environmentalists, Calls for Their Release*, CTR. FOR HUMAN RIGHTS IN IRAN (May 23, 2018), https://iranhumanrights.org/2018/05/iranian-vp-refutes-espionage-claims-against-detained-environmentalists-calls-for-their-release/ (brackets in original).

[47]    *'No Evidence' Detained Iranian Environmentalists Are Spies*, RADIO FREE EUROPE RADIO LIBERTY (May 22, 2018), https://www.rferl.org/a/iran-official-says-no-evidence-detained-environmentalists-are-spies/29243117.html.

stating that: "it has been determined that [the environmentalists] were detained without doing anything"; "the Intelligence Ministry has concluded that there is no evidence that these individuals were spies"; and "the government's fact-finding committee has concluded that the detained activists should be released because there's no evidence to prove the accusations leveled against these individuals."[48]   In September 2018, ICA Member Gholamreza Heydari stated "the Intelligence Ministry says the detained environmentalists are not spies, but these people have not been released, and this is blatant tyranny."[49]   Other ICA Members, including Deputy Speaker Ali Motahari, criticized the IRGC for overstepping its legal mandate on the ground that espionage and counterespionage operations are the exclusive domain of the Intelligence Ministry.[50]

108.    Inside Evin Prison, Morad had only limited access to the information contained in the Rouhani Commission's conclusions.  He received only occasional, unauthorized updates from guards who gave him small snippets of information.

## XII.    Defendants' Sham "Trial" Of Morad

109.    In September 2018, Defendants assigned the prosecutions of Morad and the other PWHF affiliates to Judge Abdolghassem Salavati of Branch 15 of the Iranian Government's Revolutionary Court.  Salavati presides over Branch 15, the IRGC's primary venue for the prosecution, conviction, and sentencing of political opponents, dissidents, protesters, journalists, and other individuals targeted for political prosecutions and hostage taking.  Salavati is known as the "judge of death" and the "hanging judge" because he has sentenced hundreds of defendants to

---

[48]    CTR. FOR HUMAN RIGHTS IN IRAN, *supra* n.46.

[49]    *Iran MP calls for release of environmentalists charged with 'espionage'*, BBC MONITORING (Sept. 24, 2019), https://plus.lexis.com/document/index?crid=e02e1c14-8112-4e4a-88a5-afdbbf2cfd83&pdpermalink=0d4c2a03-5b28-4354-a21c-6e4595d6a827&pdmfid=1530671&pdisurlapi=true&aci=lp&cbc=0&lnsi=cb8f0b8b-ebd6-46fc-9600-44e20ac70a46&rmflag=0&sit=1710105246603.98.

[50]    *Tehran MP Accuses IRGC Intelligence Arm Of Violations*, RADIO FARDA (Apr. 22, 2018), https://en.radiofarda.com/a/iran-mp-criticizes-irgc-intelligence/29184994.html.

death over the years.[51]  His "trials" are infamously devoid of due process, evidence, witnesses, defendants' rights, and other hallmarks of the rule of law.  In 2011, the European Union sanctioned Salavati for human rights violations, including presiding over "show trials" and mass sentencing more than one hundred demonstrators, political prisoners, and human rights activists to lengthy prison sentences.[52]  In 2019, the United States Government sanctioned Salavati for overseeing "the Iranian regime's miscarriage of justice in show trials in which journalists, attorneys, political activists, and members of Iran's ethnic and religious minority groups were penalized for exercising their freedom of expression and assembly and sentenced to lengthy prison terms, lashes, and even execution."[53]  After the United States negotiated the release of American graduate student Xiyue Wang, who was sentenced to a decade in prison by Salavati on false charges, Secretary of State Mike Pompeo referred to Salavati as the Iranian "go-to guy" for the trial and sentencing of the IRGC's political prisoners.[54]

110.    On January 30, 2019, Morad and his PWHF colleagues were brought to Salavati's "courtroom," where Iranian state prosecutors read the indictments against them.  This was the first time that Morad and his colleagues were told of the charges against them.  Reading the indictments took multiple sessions over five days because the charging documents were close to 500 pages

---

[51]     Jason Rezaian, *A new U.S. sanction reminds us that Iran's Revolutionary Courts aren't real ones*, WASH. POST (Dec. 19, 2019), https://www.washingtonpost.com/opinions/2019/12/19/new-us-sanction-reminds-us-that-irans-revolutionary-courts-arent-real-ones/; U.S. Dep't of Treas. Press Release, Treasury Sanctions Two Judges Who Penalize Iranians for Exercising Freedoms of Expression and Assembly (Dec. 19, 2019), https://home.treasury.gov/news/press-releases/sm862.

[52]     Council Regulation 359/2011, annex I, 2011 O.J. (L 100) 1, 6 (EU), https://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2011:100:0001:0011:EN:PDF.

[53]     U.S. Dep't of Treas. Press Release, *supra* n.51.

[54]     Lara Jakes, *U.S. Issues Sanctions Against Iranian Judge Who Sentenced Princeton Student*, N.Y. TIMES (Dec. 19, 2019), https://www.nytimes.com/2019/12/19/world/middleeast/pompeo-iran-human-rights-sanctions.html.

long.  After the indictment was read, Morad was brought back to Ward 2A at Evin Prison until it was time for his individual "trial," which did not conclude until October 2019.  Morad was never provided with a copy of his indictment.  In fact, he obtained a copy of the indictment only after his trial, conviction, and sentencing, and only after he had served much of his sentence.

111.    The only court document Morad was shown before his trial was a short paper that accused him of a special crime punishable by death, known as "Mof-sed fel-Arz" in Farsi, which translates roughly to "spreading corruption on Earth."  In Morad's case, the charge supposedly related to false allegations that he was a spy.

112.    Morad's so-called individual "trial" officially began in Salavati's courtroom on or around February 23, 2019 and continued, intermittently, through October 12, 2019, roughly eight months after the indictment had initially been read.  The "trial" was a complete sham, rather than a real judicial proceeding.  Morad was not allowed to have counsel of his choosing.  Salavati rejected chosen counsel and instead required Morad to use one of the attorneys on a pre-approved list that the IRGC deemed "acceptable."  From that list, Morad selected Dr. Gholam Reza Jafari, a former Revolutionary Court judge who presumably remained close to the IRGC.  Defendants' agents later came to Morad's cell with a contract stating that Dr. Jafari would represent him at trial. Morad was not allowed to speak or meet with Dr. Jafari at any time until the morning the "trial" began.

113.    Morad was permitted to meet with Dr. Jafari for the first time for just five minutes on the morning of the first day of proceedings.  An IRGC Intelligence officer attended Morad's meeting with counsel and closely monitored the entire conversation.  That brief monitored session was Morad's only meeting with counsel prior to the commencement of the proceedings.  At that point, neither Morad nor his attorney had seen the indictment or any other prosecution documents.

Neither Morad nor his attorney were permitted to view any of the IRGC "evidentiary" files because the IRGC had categorized them all as "top secret."

114.    During the proceedings, Morad's counsel did not speak once. He did not make a single objection. He did not call any witnesses. And he did not attempt to make a single statement in Morad's defense. The practical effect was that Morad was unrepresented by counsel during the proceedings.

115.    The court did not hear from any witnesses and did not allow Morad to present his defense. Instead, Salavati asked Morad questions that had been provided to the court by IRGC Intelligence officers. Morad's only opportunity to defend himself was by answering the court's questions in a manner that made his innocence clear. This was difficult, however, because the questions posed by Salavati were based on the IRGC's false premises that Morad was a spy.

116.    There was no evidence to support the charges against Morad, so IRGC prosecutors relied instead on a handful of irrelevant items, including a video clip, a photograph, and several emails. The video clip depicted a man on a motorcycle that prosecutors said had engaged in spying with Morad, but Morad did not even recognize the man. The photograph depicted a building that prosecutors said was some sort of missile-storage facility, but Morad did not recognize the building. The emails had been doctored and redacted to make it appear as if they were Morad's communications, when in fact they were not. The IRGC had simply fabricated a story and provided a few pieces of false "evidence" to the IRGC prosecutor, who presented the case to Salavati.

117.    Per Iranian law, Morad was permitted to submit to the court a written document in his defense. Morad wrote a 28-page brief attesting to his innocence, describing his lawful conservation work with the PWHF, and detailing the torture and abuse that Defendants had

inflicted on him in Evin Prison.  Morad provided the brief to the court, but Salavati never  even opened the brief, much less discussed any of the substance during the proceedings.

118.    On the final day of the trial (October 12, 2019), the IRGC said that it was downgrading the charges against Morad from "spying for an enemy state" to "cooperating with an enemy state."  The IRGC also said it was no longer seeking the death penalty, and instead seeking a 10-year sentence.  At the close of the trial, Salavati told Morad he would eventually be called back to receive his sentence.

119.    Approximately five weeks after Morad's trial concluded, Morad was called back to the court by Salavati and given a 10-year sentence.  He was also fined $600,000 USD.  Morad was offered a reduced sentence if he admitted guilt, but he maintained his innocence and rejected the court's offer.  Other members of the PWHF were convicted of the same or similar fabricated charges, but given lighter sentences.

120.    After Morad received his 10-year prison sentence, he was sent back to Evin Prison, where he was held hostage for nearly four more years.  During these four years, Morad was held in a part of Evin Prison known as "Block 4," where the conditions were squalid, abusive, and inhumane.  The Block 4 facility was vastly overcrowded, noisy, unclean, and rife with COVID-19 and other illnesses that went unaddressed.  Morad was forced into an overcrowded cell and had to sleep on the floor until there was an opening to sleep directly on the steel frame of a bunk bed. The cell was roughly 20 feet by 20 feet, with 15 prisoners.  The cell had no furniture except the bunk beds, and nothing was provided by the prison except water and prison food.

## XIII.    The Tahbaz Family's Efforts To Free Morad

121.    During the five-and-three-quarters years that Morad was held hostage in Iran, his family worked tirelessly to secure his release from prison and his and Vida's return home to the United States.  Immediately upon Morad's arrest in January 2018, Morad's family engaged

undersigned counsel to help with these efforts.  Together with counsel, Morad's family worked with the U.S. and U.K. governments and a wide range of domestic and foreign individuals and entities as part of a massive campaign to free Morad.

122.    The nature of the family's work varied over the course of Morad's detention and included a vast array of activities such as (i) retaining and instructing Iranian counsel; (ii) corresponding and meeting with Iranian officials to plead for temporary house arrest and release from prison, medical furloughs and medical care, improved prison conditions, visitation rights, and other accommodations pending release; (iii) corresponding and meeting with U.S., U.K., Swiss, European Union, United Nations, and other government and international organization officials to plead for support and assistance in obtaining temporary house arrest and release from prison, medical furloughs and medical care, improved prison conditions, visitation rights, and other accommodations pending release; (iv) coordinating and working with U.S. counsel to consider other legal arguments and avenues to obtain Morad's release and prepare for U.S. litigation against Defendants; (v) developing and implementing public relations and communications strategies to advocate for Morad's release and help ensure his wellbeing pending release; (vi) attending to Morad's and Vida's personal and business affairs, including dealing with counsel, bankers, insurers, doctors, tax authorities, and others; and (vii) performing other necessary functions to protect the interests of Morad, Vida, and the family for the duration of Morad's imprisonment.

123.    Numerous members of Morad's family—including Plaintiffs—assisted with these efforts, at considerable personal expense and sacrifice.

124.    From inside Iran, Vida led the family's day-to-day efforts to support, assist, and advocate for Morad's humane treatment and release.  Vida met and pleaded with Iranian officials,

even though she feared for her own safety and faced the constant threat that she would also be taken hostage and abused. Despite her fear of retaliation by the IRGC, Vida did all she could for Morad, including by working with the rest of the family and the family's attorneys to ensure legal representation for Morad, obtain some semblance of due process in the politically controlled "legal" process, and advocate for improved conditions and access to medical care for the many serious health problems Morad suffered due to Defendants' torture and extreme mistreatment of him while he was in custody.

125.    Outside of Iran, other family members worked tirelessly to free Morad and assist him and Vida in any way possible. Morad's and Vida's three children—Plaintiffs Roxanne, Tara, and Teymoor—did whatever they could to support their parents. They developed and ran a "Free Morad Campaign" comprised of public relations and communications efforts to obtain their father's freedom. As part of the Free Morad Campaign, they conducted interviews with the press and met with government officials in the United States, the United Kingdom, and elsewhere. They hoped that by raising awareness of Morad's case they could generate public pressure on the U.S. and U.K. governments to negotiate a deal with Iran for Morad's release.

126.    In the United Kingdom, the Free Morad Campaign was established and led by Roxanne, who became the public face of the campaign. Roxanne was hesitant to take on a public-facing role given her fear of Iran and the IRGC and her discomfort with public speaking, but like other family members, she wanted to do all she could to obtain her father's release and bring her parents home. Roxanne worked with the media and ultimately did at least 80 interviews around the world in an effort to highlight her father's plight and call for his release. She met with U.K. officials and appeared on a panel before the U.K. Parliament. Her efforts on the Free Morad Campaign became all-consuming and made it impossible to maintain a normal career or job.

Eventually, she began to lose clients and job opportunities, and as a result, she found herself living paycheck to paycheck while continuing to finance extensive travel to advocate for her father's release from Iranian custody.

127.    During this time, Roxanne felt like she was living her life under a microscope, and she sacrificed virtually any semblance of privacy, given the frequency of her public appearances on television and other media platforms.  As a result, she struggled to maintain a job and personal relationships and the stress of her work with the Free Morad Campaign also strained her relationships with other members of the family.

128.    Plaintiffs Tara and Teymoor led similar efforts in the United States, where they too made substantial personal sacrifices to fight for their father's release from Iranian prison.  They put their careers and personal lives "on pause" so they could focus on advocating for Morad's release in media interviews and meetings with government officials.  Tara left her job at the end of 2022 and became part of the steering committee for the Bring Our Families Home Campaign, which advocated for the release of Americans being held hostage.  In that role, she led initiatives advocating not only for Morad's release, but for the release of other Americans held hostage abroad, and hosted press conferences across the country.  Tara self-financed all the extensive travel related to this work, including the work on behalf of her father.

129.    Morad's mother, Plaintiff Hamideh Afshar, and Morad's sister, Plaintiff Taraneh Tahbaz, made additional contributions and sacrifices.  For example, Taraneh traveled from her home in Spain to London, England, to meet with U.K. officials.  She also attended hundreds of "virtual" meetings conducted by telephone each week for more than five years with U.K. officials from the Special Consular Cases office within the Foreign, Commonwealth, and Development Office ("FCDO"), other family members, and undersigned counsel, to share status updates, attend

to Morad's health crises and other needs, and discuss efforts to obtain Morad's release from prison and bring Morad and Vida home.

130.    Other family members made major contributions to the effort, at considerable emotional, financial, and personal cost.  They coordinated and helped pay for the efforts across numerous jurisdictions, including in Iran, the United States, the United Kingdom, and Switzerland, which played an important role as the United States' "protecting power" in Iran, given that the United States has no direct diplomatic relations with Iran.  The family's efforts included developing and implementing a multi-pronged strategy involving legal, diplomatic, public relations, and other elements to obtain Morad's release and advocate on behalf of Morad and Vida.  Those efforts also included hundreds of in person and telephone meetings, including once-weekly calls with consular officials in the FCDO and meetings with higher level officials such as the U.K. Foreign Secretary, U.K. Members of Parliament, the U.S. Secretary of State, the U.S. National Security Advisor, the U.S. Special Presidential Envoy for Hostage Affairs ("SPEHA"), and numerous Senators and Representatives in the U.S. Congress, including the delegation from Morad's home state of Connecticut:  Senators Richard "Dick" Blumenthal and Christopher "Chris" Murphy and Representative James "Jim" Himes, each of whom aided the family in their efforts to publicize Morad's plight and obtain his release.  Family members worked on a near-constant basis coordinating the family's campaign with these and other high-level officials from governments and international organizations.

131.    As will be discussed in more detail in Section XVIII, these extensive efforts to obtain Morad's release required great sacrifice and came at significant personal, emotional, and financial cost to Morad's family.  Named Plaintiffs and other family members dedicated themselves to the effort in ways that caused enormous financial burdens, harmed their professional

lives, strained their personal relationships, and caused personal and professional strife.  Named Plaintiffs and other family members also sacrificed professional earnings and incurred significant opportunity costs, while having to pay out-of-pocket expenses for legal representation, travel, food, and lodging, as part of a family-wide effort to free Morad and bring him and Vida home from Iran.

132.    Defendants compounded these burdens and costs by surveilling and intimidating the family, torturing and abusing Morad, and intentionally causing the family to feel terrorized, fearful, unsafe, helpless, anxious, depressed, and despondent.  As a direct result of Defendants' conduct, Morad and each of his family members suffered, sacrificed, and feared for their own and each other's safety for the entire five-and-three-quarters years that Morad was held hostage.

133.    During Morad's imprisonment, Defendants caused the family to fear potential retaliation for their lawful efforts to obtain Morad's release.  Indeed, Plaintiffs and other family members constantly worried that if they spoke out or said the wrong things, Defendants might subject Morad to more torture and abuse or perhaps even detain and abuse Vida or her elderly parents.  Family members also sensed that Defendants were surveilling them, trying to hack their digital devices and communications, and considering other measures they might take.  The constant fear of further harm and retaliation caused Morad and the family additional emotional distress.

## XIV.    False Hopes Of Morad's Release

134.    For a period that began in 2021 and lasted more than two years, Morad was repeatedly and falsely informed by his captors that he would soon be released in an exchange for money or other prisoners.  During this time, he was repeatedly moved to other parts of the prison (or other holding facilities) to make it seem as though his release was impending, each time only to be promptly moved back to Block 4 in Evin Prison.  As part of these unsettling events,

Defendants repeatedly sought to pressure Morad to "confess" to alleged crimes by attesting to his guilt orally or in writing while being videotaped. Defendants falsely told Morad that confessing on videotape would expedite his release from prison. Morad refused to confess or cooperate with his captors, who would then punish and mistreat him for his unwillingness to cooperate.

135.    During one instance in 2022, Defendants made it seem especially likely that Morad would be released. He was transferred back to Ward 2A in Evin Prison and placed in a suite where other political hostages had been held. Morad knew that when other prisoners were released they had been taken back to Ward 2A, just prior to their release. Defendants' media outlets in Iran even announced that Morad soon would be released to the United States as part of a negotiated deal. Thereafter, however, weeks went by without any further steps toward Morad's release. Hoping he might help catalyze a deal or at least improve the miserable conditions in the jail, Morad went on a prolonged hunger strike that lasted for days. As his health deteriorated, Defendants relented and allowed Morad to purchase food that could be delivered to him from outside the prison. After 40 days in Ward 2A, there still was no deal for his release and Morad was moved back to Block 4.

136.    Morad and the family had their hopes dashed on other occasions. Most notably, in or around March 2022, Morad and the family learned that the U.K. Government was working to negotiate a hostage-release deal. The U.K. Government owed the Iranian Government a significant debt of nearly $527 million in connection with an arms deal that was only partially completed at the time of the Iranian Revolution in 1979. The hope was that the U.K. Government would agree to pay the debt in exchange for Iran's agreement to release Morad and two other U.K. nationals held on false charges of spying. Three successive U.K. Foreign Secretaries had promised the family that the U.K. Government would not do a deal with Iran unless it included Morad, but then-serving Foreign Secretary Elizabeth Truss breached that promise by agreeing to a deal with Iran

that provided for the release of the two other U.K. nationals and left Morad behind.  Foreign Secretary Truss defended the deal on the ground that it supposedly entitled Morad to be released on house arrest in Iran,[55] but that release lasted just 36 hours.  Thereafter, Morad was forcibly returned to Evin Prison.  Feeling betrayed and abandoned, Morad began to lose hope that he would ever be released from Evin Prison.

## XV.    Defendants' Eventual Release Of Morad As Part Of A Hostage Deal

137.    Following the 36-hour "furlough" in 2022, Morad was forced to endure another year-and-a-half as a hostage in Evin Prison.  During this time, he continued to suffer from mistreatment and experienced a profound sense of hopelessness and despair.

138.    Finally, in or around the middle of 2023, Morad and the family began hearing about promising negotiations between Iran and the United States.  At this time, IRGC agents told Morad that he would be released if the United States agreed to certain Iranian demands.  In early August 2023, Morad and four other U.S. hostages were brought in front of the Chief Magistrate Judge of the court at Evin Prison, who wrote a handwritten order explaining that Morad and the other prisoners would soon be released.  The order included a provision for electronic monitoring and Defendants locked a monitor around Morad's ankle.[56]

139.    On August 10, 2023, the IRGC took Morad and three other U.S. hostages from Evin Prison in a van to nearby hotel.  The van was driven and guarded by IRGC agents and escorted by an IRGC motorcade.  At the hotel, IRGC agents were waiting to receive the hostages.

---

[55]    Patrick Wintour, *Morad Tahbaz has been freed from jail in Iran on electronic tag, U.K. says*, GUARDIAN (July 27, 2022), https://www.theguardian.com/world/2022/jul/27/morad-tahbaz-has-been-freed-from-jail-in-iran-on-electronic-tag-uk-says.

[56]    Ali Ghanaatkar has been sanctioned by Canada for his role "in the regime's gross and systematic human rights violations and actions that continue to threaten international peace and security."  *See* Gov't of Can., News Release, Canada imposes additional sanctions on the Iranian regime (Dec. 2, 2022), https://www.canada.ca/en/global-affairs/news/2022/12/canada-imposes-additional-sanctions-on-the-iranian-regime.html.

140.    While Morad was detained at the hotel, he was not permitted to leave his room without an escort of heavily armed IRGC guards.  In early September, Morad was told by the IRGC that the deal still had not been finalized, and that he would likely be staying at the hotel for another week.  Finally, on September 17, 2023, the IRGC told Morad that he and the other U.S. hostages would be leaving the next day.

141.    After anxiously waiting throughout the following day, in the late afternoon on September 18, 2023, Morad and the other U.S. hostages were hustled into a van and driven to Tehran's local airport at Mehrabad, where they were met by the Swiss and Qatari Ambassadors and an official from the Iranian Foreign Ministry.[57]  Minutes after their arrival at the airport, Morad, Vida, and the other U.S. hostages boarded a Qatari plane and were flown to Doha, Qatar, where they were exchanged for Iranian nationals in U.S. custody and other U.S. concessions, including the release of roughly $6 billion USD in frozen Iranian assets.  In Doha, Morad, Vida, and the other U.S. hostages were met by the U.S. Special Presidential Envoy for Hostage Affairs, Ambassador Roger D. Carstens, as well as a team of U.S. officials who escorted them to a U.S. Government flight back to the United States, where they eventually made their way to Fort Belvoir in Virginia.  After more than five-and-three-quarters years as a hostage in the custody of Defendants, Morad had finally returned home, along with Vida, and four other U.S. hostages.

## XVI.  Challenges Following Morad's Return Home

142.    At Fort Belvoir, Morad underwent cursory medical testing, including a test of his vital signs and tests of his blood and urine, by U.S. military doctors.  He was also assigned a U.S. military psychologist, who provided some counseling and advice regarding post-traumatic stress

---

[57]    Apparently, Morad's delayed departure was caused by the temporary disappearance of Mohammad-Reza Farzin, the governor of Iran's central bank.  Farzin's signature was required to finalize the deal, but he was uncomfortable affixing his name to any deal with the West.  Eventually, a deputy signed the deal so that Morad could be released.

disorder and other consequences of long-term trauma and wrongful detention.  The U.S. military psychologist followed up with Morad a few times thereafter, but the U.S. Government did not continue to treat Morad or provide him, Vida, or other family members any substantial medical or mental health treatment following Morad's release from years of captivity, torture, and other abuse in Iranian prison.

143.    After a few days at Fort Belvoir in Virginia, Morad was permitted to return home to Weston, Connecticut.  Once home, Morad began working to slowly rebuild his life and relationships with family and friends.  Morad's life, including his personal and professional relationships, was completely cut off from the end of 2017 until Morad was released from detention more than five-and-three-quarters years later.  Having experienced extreme mistreatment, trauma, and isolation for all that time, rebuilding his life and relationships has been a difficult task that will continue for years.  Before he was taken hostage by Defendants, Morad was part of a large, close-knit, happy family.  He had a stable and happy marriage to Vida.  He had strong and healthy relationships with their three children.  He was close to his mother and sister and his in-laws.  And he had a vast network of professional colleagues through his business ventures and the PWHF.  Following his release after being held hostage for such a prolonged period, however, everything was different.

144.    His wife, Vida, was emotionally traumatized and isolated.  His three children had suffered in his absence and were emotionally distant.  Morad noticed immediately that each of his children was less social than they had been before and he was unable to convince them to attend social gatherings, even when those gatherings were with close friends and other family members.  Morad has also found that so much has happened in their lives, and the lives of other friends and family, that it is often difficult for him to relate on a close, personal level in the way he did before

his detention. Morad's elderly mother had also suffered in his absence and was noticeably traumatized and unable to live on her own.

145.    Morad has struggled to reintegrate into the life and career that he had before he was taken hostage by Defendants. He is also much less comfortable attending group functions and social gatherings. Conversations frequently focus on his experiences as a hostage in Iranian prison, which is very difficult for him to discuss, as he tries to look forward and not dwell on the past. He also is overly vigilant and anxious, frequently concerned about potential safety risks to his family and himself.

146.    Often, Morad feels guilt for the distress and anguish his family suffered during his time in Iranian detention. For example, he feels anxiety about what Vida, their children, and his mother went through, even though he knows that the pain, injuries, and suffering experienced by his family is the Defendants' fault.

## XVII.  Evidence Of Hostage Taking

147.    The FSIA states that, "a foreign state shall not be immune from the jurisdiction of courts of the United States in any case … in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act. …" 28 U.S.C § 1605A(a)(1). For purposes of the FSIA, "hostage taking" requires only that the hostage taker sought to influence any third party by holding the plaintiff hostage. The inquiry "focuses on the state of mind of the hostage taker" and does not require the plaintiff to demonstrate that the hostage taker ever communicated its demands to a third party. *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 357 (D.C. Cir. 2006).

148.    Here, Defendants plainly engaged in hostage taking and confirmed that they had the state of mind of a hostage taker, as they repeatedly communicated their intent to take and use

Morad as a hostage.  As described above, Defendants arrested and held Morad hostage in order to influence third parties, including the United States, United Kingdom, and others inside and outside Iran.

149.    Specifically, during Morad's time in Evin Prison, Defendants' agents repeatedly confirmed Defendants' intent to hold Morad hostage, *e.g.*, by repeatedly telling Morad that he was being held as a bargaining chip to compel the U.S. and U.K. governments to agree to certain concessions such as releasing Iranian nationals and frozen Iranian assets.  There are many examples of such statements, including the following:

a.    Morad's interrogators joked that his room was "very heavy" because it held prisoners with foreign passports and that Iran would get a massive amount of money for the prisoners held in the room.

b.    Sympathetic prison officials frequently told Morad that his imprisonment would eventually end, as soon as Iran got its money from the United States.

c.    At one point, an IRGC official told Morad that it was "a shame" he got caught up in "political nonsense," and that Morad was just a pawn in a game for Iran which has resorted to making money from "this practice" of holding foreigners hostage and exchanging money for their release.  Other such comments were made by IRGC guards when they were alone with Morad.

d.    Morad was told more than once by Iranian prison officials that Iran would never "let him go" to the British because the Americans would pay Iran more for him.

150.    As reported in a wide variety of media sources, Iranian public statements demonstrate that Iran held Morad in prison to obtain leverage against the United States for foreign policy concessions or the release of persons or assets of value to Iran.  For example:

a.      In April 2018, shortly after the United States pulled out of the JCPOA, Foreign Minister Zarif suggested during an interview with CBS's Face the Nation that Iran would be open to a prisoner swap if President Trump showed Iran more respect and stopped making references to regime change.  A swap "is a possibility, certainly from a humanitarian perspective, but, but it requires a change of attitude," Zarif said, "and a change of language."[58]

b.      In December 2019, while Morad was being held and following a prisoner exchange where U.S. graduate student Xiyue Wang was exchanged for Iranian scientist Massoud Soleimani, Iranian officials indicated a willingness to pursue additional prisoner swaps.  Regime spokesman Ali Rabiei said, "we are ready to cooperate to return all Iranians unlawfully imprisoned in the U.S."  Similarly, foreign Minister Zarif said in a tweet "[t]he ball is in the US' court," and stated Iran was "fully ready for comprehensive prisoner exchange," while attending a regional conference in Istanbul, Turkey.[59]

c.      In May 2021, Iranian state TV quoted an anonymous official as reporting that there was a deal made between the United States and Iran involving a prisoner swap and the U.S. release of $7 billion in frozen Iranian assets.  The Iranian state TV report came just as Supreme Leader Ayatollah Ali Khamenei began giving what authorities earlier described as an "important" speech, indicating that the use of U.S. prisoners in Iranian custody to extract economic concessions from foreign powers was sanctioned at the highest levels of the Iranian Government.[60]

---

[58]      Nicole Gaouette, *Trump's nuclear decision is bleak news for Americans held in Iran*, CNN (May 12, 2018), https://www.cnn.com/2018/05/09/politics/iran-detainees-north-korea-questions/index.html.

[59]      Nasser Karimi, *Iran ready for more prisoner swaps with US, not negotiations*, ASSOCIATED PRESS (Dec. 9, 2019), https://apnews.com/general-news-693e7c13192bd8c0e7679af5dcbd649e.

[60]      Amir Vahdat et al., *State TV: Iran reaches deals to release prisoners; US denies*, BOS. GLOBE (May 2, 2021), https://www.bostonglobe.com/2021/05/02/world/state-tv-iran-reaches-deals-release-prisoners-us-denies/.

151.    U.S. and U.K. officials have also concluded that Morad was a hostage who was wrongfully detained by Defendants.  For example:

a.    In a letter from U.S. President Joseph R. Biden, Jr. to Morad's family, dated June 22, 2021, the President referred to "Tehran's decades-long practice of holding hostage innocent citizens of foreign countries, including many U.S. citizens," described this practice as "cruel and deplorable," and stated that Morad was "being held hostage as a bargaining chip on unfounded charges."[61]

b.    Pursuant to section 302(a) of the Robert Levinson Hostage Recovery and Hostage-taking Accountability Act at 22 U.S.C. § 1741, the U.S. Department of State designated Morad as detained "unlawfully or wrongfully," as evidenced by the referral of the case to the Special Presidential Envoy for Hostage Affairs who used his statutory and regulatory authorities to pursue Morad's release as a hostage of Iran.

c.    In a letter to U.S. Representative Jim Himes of Connecticut, dated November 19, 2019, the U.S. Department of State acknowledged in writing that Morad was "wrongfully detained" in Iran based on "fabricated" charges.  The State Department letter further confirmed that the official policy of the United States was to obtain Morad's release and, in the meantime, to provide him and his family "as much support as [it] can during this time."

d.    U.S. House Foreign Affairs Committee Ranking Member Michael McCaul and Chairman Gregory W. Meeks issued a press release regarding Morad's case, urging the "expeditious release of innocent U.S. civilians currently being held hostage by Iran."[62]

---

[61]    Letter from President Joseph R. Biden Jr. to Tahbaz Family (June 22, 2022).
[62]    Foreign Affs. Comm., Press Release, McCaul, Meeks Release Statement Regarding U.S. Hostages Held in Iran (June 6, 2022), https://foreignaffairs.house.gov/press-release/mccaul-meeks-release-statement-regarding-u-s-hostages-held-in-iran/.

Congressman McCaul later introduced a bill, The No Funds for Iranian Terrorism Act, referring to Morad as an "American Hostage."[63]

   e. In a documentary film regarding Morad, Representative Jim Himes and Senator Richard Blumenthal referred to Morad as a "hostage" who was wrongfully detained by Defendants.[64]

   f. In a report issued by the U.K. House of Commons Foreign Affairs Committee entitled "Stolen years: combatting state hostage diplomacy" issued in April 2023, the Committee referred to Morad as a "hostage of Iran."[65]

152. The terms of the deal that resulted in Morad's release confirm that Iran held and used him as a hostage to extract valuable concessions from the United States.  In particular, as The White House described the deal, Iran exchanged Morad (and four other Americans) for the "clemency" of five Iranian prisoners in U.S. custody and the release of "$6 billion in Iranian funds" that had been frozen in South Korean banks at the behest of the United States.[66]  Iranian leaders boasted about the terms of the deal, including the release of the $6 billion in exchange for Morad and the other Americans.

153. Iran has an extensive, well-documented history of taking American hostages.  On the heels of the Islamic Revolution in 1979, Iranian militants seized the American Embassy in Tehran and took 52 U.S. diplomatic and military personnel hostage.  "These hostages remained in

---

[63] No Funds for Iranian Terrorism Act, H.R. 5961, 118th Cong. § 2 (2023).

[64] Nate Colman Films, *Innocents Held Hostage | Morad Tahbaz, a Pawn*, YOUTUBE (Mar. 4, 2022), https://www.youtube.com/watch?v=kFWrBk3wLgY.

[65] Foreign Affs. Comm. Press Release, *supra* n.62.

[66] *See Background Press Call by Senior Administration Officials on the Return of American Detainees from Iran*, WHITE HOUSE (Sept. 17, 2023), https://www.whitehouse.gov/briefing-room/press-briefings/2023/09/17/background-press-call-by-senior-administration-officials-on-the-return-of-american-detainees-from-iran/.

Iranian custody for 444 days and were subjected to physical and mental torture and inhumane conditions of confinement."[67]  Much like Morad, those first U.S. hostages of Iran were blindfolded; held in isolation; provided "minimal clothing, food, water, and medical care"; and prohibited from communicating with one another or their families.[68]  The hostages were subjected to repeated interrogations and threatened with physical injury as well as physical injury to their loved ones.[69]  The hostages ultimately were released after the United States agreed to unfreeze Iranian assets in the United States and terminate all legal proceedings against Iran in U.S. courts.[70]

154.    During the ensuing four decades, Iran has consistently targeted American citizens, particularly dual Iranian-American citizens, for hostage taking.  Defendants' longstanding pattern of wrongful detentions of U.S. hostages, along with other acts of terrorism, caused the U.S. Government to officially designate the IRGC as a "Foreign Terrorist Organization" ("FTO") under Section 219 of the Immigration and Nationality Act.  As the U.S. Government stated at the time of that designation, "the IRGC … direct[s] and carr[ies] out [the regime's] global terrorist campaign."[71]  The U.S. Government further stated that "the IRGC … has engaged in terrorist activity or terrorism since its inception," including "taking hostages and wrongfully detaining numerous U.S. persons, several of whom remain in captivity in Iran today."[72]

155.    There are many examples of Iran's hostage-taking of U.S. citizens, resulting in U.S. court judgments against Iran under the FSIA exception to immunity for terrorism, torture, and

---

[67]    *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 146 (D.D.C. 2002), *aff'd*, 333 F.3d 228 (D.C. Cir. 2003).
[68]    *Id.*
[69]    *Id.*
[70]    *Id.* at 147.
[71]    *See Designation of the Islamic Revolutionary Guard Corps: Fact Sheet*, U.S. DEP'T OF STATE (Apr. 8, 2019), https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/.
[72]    *See id.* (referring to U.S. hostages in Iranian custody on April 18, 2019).

hostage taking.  For example, Nik Moradi, a dual Iranian-American citizen, successfully sued Iran for holding him hostage in 2007.[73]  Moradi was held in solitary confinement for five-and-a-half months and removed from his cell only for interrogations.  The hideous prison conditions and treatment afforded Moradi were strikingly similar to those afforded to Morad here: part of a pattern and practice of torture and abuse.  Moradi, like Morad, was kept in solitary confinement beyond the period permitted under Iranian law, was blindfolded whenever he was taken out of the cell, and was verbally threatened and mentally and physically abused.  During his detention, Moradi was "constantly starving."[74]  Furthermore, Moradi "was repeatedly subjected to lengthy interrogations, during which he was accused of working with foreign agencies against Iran and of being a spy."[75] During those interrogations, "he was both verbally threatened and mentally and physically abused."[76]  Like Morad, Moradi lost roughly 60 pounds as a result of the mistreatment during his detention.

156.    In another example that was also the subject of litigation and a hostage-taking judgment against Iran in a U.S. court, Iran took Jason Rezaian, a dual Iranian-American citizen and reporter for The Washington Post, hostage in 2014.  Rezaian was held hostage for 544 days— from July 22, 2014 to January 16, 2016—while IRGC and other Iranian agents tortured and tormented him using a cruel combination of harsh physical mistreatment and extreme psychological abuse.  Again, the prison conditions and treatment afforded Rezaian were strikingly similar to those here.  Iran held Rezaian in prolonged solitary confinement, deprived him of sleep, aggressively and relentlessly interrogated him, denied him basic medical treatment for serious and

---

[73]    *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 60 (D.D.C. 2015).
[74]    *Id.*
[75]    *Id.*
[76]    *Id.*

painful illnesses and infections, and threatened him with dismemberment, execution, and other forms of cruel and unusual physical torture.  For most of his 544 days of imprisonment, Rezaian —like Morad—suffered from various illnesses and health complications, including severe weight loss, infections, anxiety, paranoia, and major depression, all without adequate medical care or treatment.

157.    The 1979 hostages, Moradi, and Rezaian are just a few examples of Iran's years-long, systematic targeting of innocent Americans as hostages, used by Iran as valuable pawns in the conduct of its foreign relations with the United States and others.[77]  An expert report submitted in support of plaintiff Moradi noted that Iran has detained dual Iranian-American citizens "as part of a pattern and practice of behavior … in which illegal actions were directed against such dual citizens for political purposes of the Iranian regime.  These purposes included coercing political prisoners to make false confessions that they had taken actions against Iranian state on behalf of the American government."[78]  Experts in other cases, including Rezaian's, have offered similar testimony regarding Iran's unlawful practice of hostage taking.

---

[77]    *See, e.g.*, *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 212 (D.D.C. 2012) ("Iran and MOIS intentionally caused the [kidnapping and torture of Reed]."); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 148 (D.D.C. 2010) (noting MOIS "had developed a particular expertise in taking and holding hostages and operating secret prisons for hostages"); *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 138 (D.D.C. 2009) ("These terrorism cases are the tragic stories of the many victims—like the more than one thousand victims represented here today—who have suffered dearly as a result of [Iran's] campaign of terror that has included hostage takings, torture, suicide bombings, and assassinations."); *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 96-98 (D.D.C. 2003) (noting Regier's kidnapping "'fit[] so much into th[e] pattern' of kidnappings that Iran was known to have supported" and "that the Islamic Republic of Iran and MOIS have been found responsible for acts of torture and hostage-taking in a number of cases" (second alteration in original) (quoting Dr. Patrick Clawson, an expert on Iran's politics, economics, and sponsorship of terrorism)), *abrogated on other grounds*, 353 F.3d 1024 (D.C. Cir. 2004).
[78]    *Moradi*, 77 F. Supp. 3d at 64 (quoting expert report of Medhi Khalaji of the Washington Institute for Near East Policy).

## XVIII. Injuries To Plaintiffs

### A.      Injuries To Morad

158.      Defendants' unlawful arrest and 2,077-day detention of Morad caused him severe and enduring injuries.

a.      Morad suffered a range of serious physical injuries and was deprived of critical medical care for such injuries.  He suffered urinary tract infections, urethral strictures, gastrointestinal disorders, kidney issues, and bursitis of the hip.  Due to constant infections and strictures, Morad was forced to undergo multiple emergency procedures while he was in detention, to relieve the strictures and infections in his urethra.  As a result of these procedures, he also had to take intensive regimens of antibiotics that caused serious gastrointestinal issues, reduced his appetite, and harmed his overall physical and mental state.  An erroneous cancer diagnosis also resulted in Morad undergoing unnecessary chemotherapy treatments, which introduced serious toxins into his body and exacerbated his other medical problems.

b.      Morad also suffered permanent hearing loss due to the physical abuse he sustained while he was being aggressively interrogated by IRGC agents.  He also experienced extreme dehydration and malnutrition resulting in extreme weight loss of more than 60 pounds.  Finally, Morad suffered from COVID-19 infections and severe symptoms, including full-body aches and fevers, no fewer than six times.  Morad continues to be affected by these physical injuries and has required continuing medical care since his release.

c.      Throughout his detention, Morad also suffered from psychological abuse, which resulted in mental distress and other mental health issues that continue to this today.  For a period of months, he was held in solitary confinement, causing him extreme psychological distress.  While isolated in solitary confinement, Morad was confined to a cramped and filthy cell with no human interaction except for exhausting and brutal interrogations, during which he was

blindfolded and relentlessly terrorized and abused. His cell was constantly illuminated and noisy, and he was forced to sleep on a cold, concrete floor, which caused chronic medical conditions and made it virtually impossible to sleep more than a few minutes at a time. He was constantly exposed to screams and cries of anguish from prisoners in distress in nearby cells. But he was not allowed out of his cell, except for interrogations and a brief "exercise" walk while blindfolded. The extreme isolation coupled with inhumane conditions, relentless interrogation, lack of medical care, insufficient food and water, and brutal mistreatment caused Morad to suffer mentally and even hallucinate, including seeing shapes and figures on the walls of his cell. During the entire period in solitary confinement and intermittently over the entire five-and-a-half years, Morad believed he was going to die or be killed.

d.     Morad continues to suffer from sleeplessness, fatigue, and other medical problems. For example, he suffers complications from permanent urethral damage: before his detention he had to self-catheter once a month, but now he must perform this painful and burdensome procedure once a week. His unlawful detention in Iran has dramatically changed his outlook on life and made it difficult for him to work on things he previously prioritized and enjoyed, such as spending time with family and friends or conducting his business. Morad feels anxiety regarding his family's wellbeing and safety. He also feels guilt and anxiety from the pain and suffering that his ordeal has caused other members of the family.

e.     Morad was also separated from his wife and children for five-and-three-quarters years. In the case of the three children, these were formative years of their young adulthoods. Today, while Morad and his children—Plaintiffs Roxanne, Tara, and Teymoor—are grateful to finally be together again, their relationships are strained and distant at times because of the many years they spent apart. Morad has found it harder to convince his children to spend time

with close family members or participate in certain family activities that used to be typical for them. Morad also continues to feel a sense of guilt for the pain and suffering his family went through during his detention, and the personal costs they paid working to obtain his release from Iran.

       f.      Morad also finds it more difficult to be social after his detention and spend time at parties or with friends. He finds talking about his detention especially painful in these contexts, but the topic often arises in conversation, which adds to his anxiety and stress in these situations.

159.    Morad also suffered economic losses as a result of his years of detention in Iran. His family spent considerable sums of money on travel, food, lodging, and other expenses associated with the campaign to free him from prison. In addition, he lost five-and-three-quarters years during which he could not pursue business opportunities or realize his earning potential; those five-and-three-quarters years would have been the most prime years of his professional life. His detention forcibly terminated his work on a major development project in Monticello, New York, where he was one of the lead investors in a partnership that had very promising development prospects. The land that had been purchased for that project will now need to be sold. Before his detention, Morad was a leading businessman with successful investments in New York City and the surrounding area. Now, after his traumatic experience in Iran and years-long separation from his work and family, he feels unable to work on and lead deals. Defendants have effectively stripped Morad of his highly successful professional life and lucrative livelihood.

160.    Defendants caused Morad additional economic losses by seizing his papers, effectively invalidating his family's property rights, terminating his further pursuit of his family's

property claims in Iran, and cutting off his ability to pursue those claims in the future or otherwise control and liquidate any family assets in Iran.

### B.    Injuries To Hamideh

161.    Iran's imprisonment of Morad caused his mother, Hamideh, to suffer extreme mental anguish and emotional pain and suffering, and also to be deprived of the services, society, guidance, solatium, and consortium of Morad and his family.

162.    Hamideh suffered the pain, anguish, and anxiety of a mother who feared that her son and his wife would not survive and that her grandchildren would lose their parents.  She lived with the terror of knowing that her son was being held in unthinkable conditions and that he might be tortured to death, executed, or held forever in Evin Prison.

163.    Additionally, as described in paragraph 16, *supra*, shortly after Morad was detained, Hamideh suffered a severe emotional breakdown.  She became delirious and could not tell where she was, at times thinking she was in other countries or continents, despite having lived in Spain for years.  At that time, she was admitted to a hospital for ten days.  During her extended hospitalization, Hamideh also suffered severe physical health problems and symptoms.  For example, doctors found that her blood pressure and heart rate were elevated and that she had fluid in her lungs.  Doctors attributed her symptoms to the extreme stress she was experiencing as a result of her son's arrest and detention in Iran.  As a result of the mental and physical symptoms of her stress, Hamideh could no longer live alone.  She moved in with her daughter, Plaintiff Taraneh Tahbaz, who had to modify her apartment to make it accessible for her mother.  Taraneh also hired two home health aides to assist with the 24-hour care that her mother, Hamideh, required.

164.    Today, Hamideh suffers from ongoing anxiety regarding the physical and emotional well-being of her children and grandchildren.  She worries in particular about their ability to sustain healthy and meaningful relationships with one another, given the trauma each has endured.  She

fears that Iran's crimes may have forever traumatized her son and his family and may have irreversibly altered their relationships with one another as well as other important relationships in their lives.

### C.    Injuries To Taraneh

165.    Iran's imprisonment of Morad caused his sister, Taraneh, to be deprived of the services, society, guidance, solatium, and consortium of Morad, and to suffer extreme mental anguish and emotional pain and suffering.

166.    Taraneh suffered a significant decline in her physical and mental health as a result of Morad's imprisonment.  Taraneh suffered severe psychological distress knowing that her brother was being abused in Evin Prison and might not survive, which caused her serious health problems. During and after Morad's incarceration, Taraneh suffered from anxiety, stress, and hair loss and developed a stress-related lymphatic disorder, and many of these symptoms have not abated.  They have affected, and continue to affect, her ability to work and continue her successful career at American Express.  Taraneh has had to see both psychologists and a psychiatrist to treat the lasting psychological injuries caused by Defendants' actions.

167.    Taraneh committed increasing amounts of her time to the effort to free Morad, including by giving interviews to the media during the last two years of Morad's detention.  She was forced to step away from her job at American Express given the demanding nature of her advocacy on behalf of Morad, especially after the U.K. Government failed to secure Morad's release in 2022.  As a result, she incurred significant financial difficulties and had to dramatically change her lifestyle.  Not only did she lose her income, but she also incurred significant travel expenses as part of her advocacy for Morad's release.  In particular, she traveled numerous times from her residence in Spain to London and Brussels to meet with U.K. and E.U. officials to advocate for her brother's release from Iran.  Taraneh incurred substantial travel, food, and lodging

expenses as a result of these trips to help free her brother. She also incurred substantial expenses and other burdens when their mother, Hamideh, suffered her breakdown, moved into her home, and required full-time nursing care.

168.    Taraneh still suffers from the trauma caused by Defendants. She has anxiety and requires regular visits to a psychologist. Taraneh's relationship with her family has also suffered: they have always been a close-knit family, but the emotional and financial stress of the hostage taking put severe strain on the family, and they have yet to recover from the severe toll that Defendants' arrest, imprisonment, and abuse of Morad took on them.

### D.    Injuries To Roxanne

169.    Iran's imprisonment of Morad caused his daughter Roxanne to be deprived of the services, society, guidance, solatium, and consortium of Morad, and to suffer extreme mental anguish and emotional pain and suffering.

170.    Roxanne, Morad's oldest daughter and firstborn, was always exceptionally close to him. Roxanne had a special connection with her father and they would talk almost every day before his detention. She viewed him as her best friend and her most trusted confidant. Roxanne relied on Morad for everything from career advice to relationship advice.

171.    Roxanne and her father shared a love of art, auctions, and museums, a passion Roxanne turned into a career working at art auction houses. She began her career at Phillips auction house and often talked about her professional pursuits with her father, bonding over their shared love of art and the art business. When Phillips offered her a promotion and a raise to move to London to become an administrator in their post-war department, her first call was to Morad to ask his advice. He told her to take the job, so she did, despite the fact that she knew very few people in London and was worried about moving so far from home. Eventually she moved into a

broader administrative role overseeing European offices.  Before he was detained, Morad often visited her in London and the two were constantly in contact about her work and personal life.

172.    After Morad was taken hostage by Iran, Roxanne felt extreme distress and struggled to cope with the crisis in the absence of her father.  Whenever she thought about her father being tortured by the IRGC in Evin Prison, she would break down from the deep distress.  So deep were her feelings of distress, it was often too traumatic for her to engage with the rest of her family.  As the weeks and months of her father's detention wore on, Roxanne found herself isolated and disconnected from family and friends.

173.    In order to advocate for Morad's release, the family decided to undertake the Free Morad Campaign, of which Roxanne was the public face in the United Kingdom.  *See* Section XIII, *supra*.  Although she found public speaking terrifying and had no desire to become a public figure, she agreed out of a desire to help her father.   Roxanne, who previously had no campaign or media experience, was thrust into the epicenter of a complex, high-stress political situation in which she was serving as the principal family member to lead the public fight for her father's release.  She had to make frequent, high-stakes judgment calls about what information to share publicly and how to develop diplomatic and media strategies, all of which caused her to feel a sense of extreme uncertainty and psychological stress.   Roxanne conducted more than 80 interviews, including televised and print-press interviews, during her father's 2,077 days in detention.  The interviews often required many hours of preparation.  Roxanne spent countless hours preparing for and giving the interviews.  She often had to miss work to set up, prepare for, and participate in interviews and other activities.  When she eventually moved into a consulting role at work so that she could devote additional time to the Free Morad Campaign, it seemed that some clients declined to hire her because of her public involvement in a high-profile dispute with

a dangerous foreign country. Roxanne felt that her performance during televised interviews was subject to critique and she suffered tremendous anxiety and guilt, feeling that each day her father spent in Evin Prison was a personal failure by her.

174. Roxanne's career suffered during Morad's detention, even beyond the need to lead the Free Morad Campaign, organize the family's efforts, and prepare for and participate in television and media interviews. At the time Morad was taken hostage, Roxanne was about to make a professional transition from her consulting work in the art auctions industry, to a new job at Avant Arte, a contemporary art marketplace. However, the company unexpectedly and inexplicably rescinded its offer of employment to Roxanne. Roxanne believes that the company rescinded the offer due to concerns about her father's imprisonment in Iran, her level of commitment to the company in light of his imprisonment, and the possibility that her mind would be focused on efforts to free her father, rather than on her new job. Having lost that opportunity, Roxanne returned to Unit London, a company for which she had previously worked in the area of event management and corporate relationships. Roxanne could not be as effective as she was before, however, due to concerns about the potential impacts of her work on her father's situation. For example, in order to effectively manage corporate events and corporate relationships, Roxanne had previously been very social and had attended high-profile events with alcohol and entertainment. After her father was taken hostage, however, she was advised that she should not attend public parties or events where Defendants might surveille and photograph her appearing to party with alcohol, as that could be used as "evidence" against her father in Iran, where alcohol is illegal and partying at events with alcohol is viewed as sinful. She found it difficult to manage corporate events or entertain clients while harboring such concerns. Roxanne's concerns that Defendants were watching her and looking for ways to use her conduct against her father

negatively impacted her work and her career. She also skipped important business travel to Middle Eastern countries, including Dubai and the United Arab Emirates, because she was afraid that she could be followed, harassed, or even detained anywhere in the region by agents of IRGC Intelligence. Declining to take these trips hurt her career. Eventually, she concluded that she could not sustain a full-time job while leading the Free Morad Campaign and attending to her family's needs. As a result, she left her job at Unit London, and became a self-employed business development consultant. This change further set her back; and even her work as a consultant suffered as result of Morad's detention. She struggled to attract and retain clients who were reluctant to hire a public figure whose family was the target of the Iranian state. In addition, because Roxanne was sometimes publicly critical of the U.S. and U.K. governments' insufficient efforts to secure her father's release, some clients and potential clients chose not to associate with her.

175.    Roxanne also lost meaningful personal relationships, while others became severely strained. For instance, when it came time for her and her friends to renew their lease for a shared apartment, her friends no longer wanted to live with her because they were afraid that they or their families might be targeted by Iran and the IRGC. Roxanne also found it extremely difficult to date or develop romantic relationships. She did not feel safe going out to restaurants or social events, especially with people she did not know well. She had also been advised not to discuss the details of her father's detention with anyone outside the family, which made it difficult to open up to potential romantic partners about the most significant thing in her life, her father's detention. Eventually, Roxanne found a romantic partner, but found it difficult to build a new relationship because she felt that she needed to keep hidden information about her father and her emotions regarding his detention.

176.    Like her siblings, Roxanne constantly felt anxious, unsafe, and fearful that Defendants were potentially watching or surveilling her or her work or home.  For example, there were numerous times when Roxanne identified what appeared to be attempts by Defendants to hack and access her electronic devices, which contributed to the sense that they were surveilling and tracking her, causing her to feel unsafe.

177.    After the Free Morad Campaign began, Roxanne devoted nearly all of two years to advocacy on her father's behalf.  She set aside her career and spent considerable amounts of money in pursuit of her father's freedom.  Her professional progress, relationships, and ability to earn an income all suffered as a result.  Her focus on securing Morad's release also took an enormous toll on her family and personal life, severely straining her relationships, including with her partner.

178.    Roxanne also suffered a significant decline in her physical and mental health as a result of Morad's imprisonment.  With the knowledge that her father was being abused in Evin Prison and might not survive, Roxanne suffered severe psychological distress, which caused her numerous, serious health problems.  Roxanne became depressed, paranoid, anxious, and afraid to be alone.  During and after the period of Morad's incarceration, Roxanne suffered from panic attacks, sleep deprivation, anxiety, loss of concentration, stress, hair loss, rapid weight gain, high cortisol levels, and amenorrhea, and many of these symptoms have not abated since Morad's release.  These symptoms affected, and continue to affect, Roxanne's ability to lead a fulfilling personal and professional life.

### E.    Injuries To Tara

179.    Iran's imprisonment of Morad caused his daughter Tara—Morad's second child— to be deprived of the services, society, guidance, solatium, and consortium of Morad, and to suffer extreme mental anguish and emotional pain and suffering.  Morad's detention also caused Tara to

forgo career opportunities and expend significant funds of her own trying to manage the family's affairs while her mother and father were detained in Iran.

180.    Tara was with her parents when Morad was initially detained and interrogated at the airport on November 16, 2017.  She was shocked and scared, and that feeling never abated. When she left Iran, she was terrified about what would happen next and worried she might never see her parents again.  Her emotional distress lasted for the next five-and-three-quarters years and still continues to this day.

181.    The stress from Morad's detention had an immediate impact on Tara's career.  Prior to the trip to Iran, Tara had recently accepted a new job that she was scheduled to start after Thanksgiving in 2017.  However, her anxiety about her father's inability to leave Iran was so high that she rescinded her acceptance of the position and opted not to take the job.  So intense was her distress that she feared she would immediately fail in the new position.  All she could think about was her father's detention and the severe threat that Defendants posed to both her parents.  In January 2018, she managed to obtain another job and began working out of necessity to pay her rent, but eventually she lost that job because she did not attend official social gatherings, and thus was considered to not be a "social fit" with the company.  Tara believes this description was accurate, but she also believes that she was not a "social fit" with her co-workers only because her father's dire situation in Iran had caused her to become anxious, paranoid, and depressed.  She could not interact normally in an office environment because of the psychological strain of knowing that her father was likely being abused, or even tortured to death, by IRGC agents in Evin Prison.  Her distress worsened with the knowledge that PWHF co-founder Kavous Seyed-Emami had died—likely as a result of torture by IRGC agents—in the same place her father was being held.  In September 2018, she accepted a job at a startup beauty company, but again was not able

to perform or advance professionally because she was anxious, depressed, and focused on her parents' dire situation and the all-consuming efforts to free her father. In addition, she often took leaves-of-absence to attend to difficult family affairs such as managing family finances and contributing to the Free Morad Campaign. Like Roxanne, Tara gave many interviews to the press. Tara, like Roxanne, was thrust into the public eye and had to make frequent, high-stakes judgment calls about which information to share publicly, which to disregard, and how to develop diplomatic and media strategies, all of which caused her to feel a sense of extreme uncertainty and psychological stress.

182. Because she was the oldest of Morad's children residing in the United States (as Roxanne lived in London), Tara was largely responsible for managing the family's affairs. Just 28 years old in 2018, when Morad was taken hostage, Tara felt overwhelmed by her family responsibilities. She had to manage the family's finances, including overseeing the preparation and payment of taxes, managing family accounts, and making sure the family's bills were timely paid. She also had to put down the family dog, which was extremely difficult for her and the family, especially Vida. In addition to managing the family's financial affairs, Tara had to regularly travel from her residence in New York City to her family's home in Connecticut, to help maintain the home in Morad's and Vida's years-long absence. Without Morad's income, and due to the expenditures of daily life and efforts to secure his release, the family's liquid accounts became depleted. Consequently, Tara had to travel to Costa Rica several times in the midst of the COVID-19 pandemic to oversee the sale of the family's vacation home in order to liquidate enough cash to cover basic expenses and the costs of trying to free Morad. Selling the family's home in Costa Rica was especially painful because Morad and Vida had purchased it as a family retreat and refuge—for 14 years, Vida's entire side of the family had gathered in Costa Rica for Christmas,

but the home was gone in a matter of days. During all these traumatic events, Tara was fearful to speak openly to Vida or other family members, knowing the IRGC would likely be listening to any conversation they had.

183.    Tara also lost multiple meaningful relationships and other relationships became severely stained. She found that people she considered friends were abandoning her, perhaps out of fear that they might be targeted or because they felt that Tara was consumed with her family crisis. Tara felt that her life had become so different from that of her peers in New York City that it became difficult to relate to other young people or form close relationships. It became challenging for her to form new, meaningful relationships because of her state of mind and her singular focus on securing her father's release. When the COVID-19 pandemic hit, Tara moved back to her parents' home in Connecticut in order to save money, further hindering her ability to maintain the relationships and friendships she had developed over the years in New York City.

184.    Like her siblings, Tara identified what appeared to be multiple attempts to hack and access her electronic devices and perceived that Defendants were surveilling and tracking her, leading her to feel unsafe. For example, several times at the beginning of her father's detention, her computer webcam would turn on by itself. Fearing for her and her family's safety, she installed new security systems in her apartment and at the family's Connecticut home. The constant fear that she was being watched contributed to her anxiety and paranoia.

185.    Tara suffered a significant decline in her physical and mental health as a result of Defendants' hostage taking and terrorism. With the knowledge that her father was being abused in Evin Prison and might not survive, Tara suffered severe psychological distress, which in turn caused other serious health problems. Tara became severely depressed, paranoid, and anxious. During and after the period of Morad's incarceration, Tara suffered from panic attacks, sleep

deprivation, anxiety, loss of concentration, and stress, and many of these symptoms have not abated. These symptoms affected, and continue to affect, her ability to work and develop and maintain meaningful relationships.

**F.    Injuries To Teymoor**

186.    Iran's imprisonment of Morad caused his son Teymoor—his youngest child—to be deprived of the services, society, guidance, solatium, and consortium of Morad, and to suffer extreme mental anguish and emotional pain and suffering.

187.    Morad had been Teymoor's idol and best friend. Prior to Morad's detention, Teymoor and Morad spoke almost every day by telephone. Teymoor looked up to Morad and sought to be just like him: Morad went to Colgate, so Teymoor went to Colgate; Morad had a successful career in real estate development, so Teymoor hoped to build a successful career in real estate development, or even go into business with his father. When Morad was taken hostage by Defendants, however, Teymoor lost his best friend and his professional aspirations became impossible.

188.    During Morad's detention in Iran, Teymoor began working in his first real estate job after receiving his bachelor's degree from Colgate and his master's degree from University College of London. His first job was at a multi-national Australian real estate development and construction business called Lend Lease and Teymoor initially worked out of the company's offices in Manhattan. Once the COVID-19 pandemic began, Teymoor moved back home to Connecticut to be with his family as they worked to advocate for Morad's release. The stress of his father's detention and his parents' dire situation made it difficult for Teymoor to focus on work, however, and the daily commute back and forth to New York City proved unsustainable, so he left his job with Lend Lease in New York City for a job with a different firm in Connecticut. As the family became more active in their public advocacy for Morad's release, Teymoor found that he

could no longer balance his professional responsibilities with his obligations to his family, and he resigned from his job in Connecticut. He chose instead to start his own company, which he hoped would enable him to have greater flexibility to attend to the family crisis.

189.    However, these changes came with a steep professional and financial cost. Teymoor went close to a year without a salary, which had a significant impact on his livelihood, professional confidence, and lifestyle. He believes that his frequent moves between firms and self-employment have had negative impacts on his early career and may adversely affect him throughout his career, given the importance of early career experiences in the real estate industry.

190.    Teymoor's injuries also extend beyond his career and his finances. Like his sisters, he suffered emotionally and lost multiple meaningful relationships due to the stress and impact of Defendants' hostage taking and terrorism. Teymoor feels that Morad's detention and the crisis that ensued left him broken emotionally. He believes that it caused him to erect emotional "walls" and that these walls make it difficult for him to experience or show the genuine emotions he feels at any given moment. Many people he viewed as close friends were not able to handle or discuss his family's situation, which left him isolated and alone, at a time when he needed support.

191.    Defendants' actions also caused Teymoor to feel anxious and unsafe. During Morad's detention, Teymoor identified multiple attempts to hack and access electronic devices and social media accounts registered in the names of him or his family members, leading Teymoor to feel unsafe, as if Defendants were watching him and trying to pry into his private life. To this day, Teymoor still suffers from anxiety and abnormally high blood pressure, and often has trouble sleeping.

## COUNT ONE

### PERSONAL INJURY CAUSED BY HOSTAGE TAKING (MORAD)

192.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

193.    The FSIA confers jurisdiction on the courts and creates an independent federal cause of action to recover for injuries sustained as a result of terrorist acts, such as hostage taking or torture.  An action for hostage taking requires that (1) there was an act of "hostage taking"; (2) the act was committed by the foreign state or "an official, employee, or agent of such foreign state"; (3) the act "caused" (4) "personal injury or death" (5) "for which the courts of the United States may maintain jurisdiction under this section for money damages."  28 U.S.C. § 1605A(a)(1), (c); *accord Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 10-11 (D.D.C. 2010).

194.    Seizing an individual in an effort to extract concessions from the United States, the United Kingdom, or others is hostage taking within the definition of the FSIA.  *See, e.g.*, *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 176 (D.D.C. 2019); *Massie v. Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 67-69, 74 (D.D.C. 2008); *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 25 (D.D.C. 2001).  A plaintiff need not show that the hostage taker actually extracted such concessions, or even that it communicated its intent to the third party, *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 357 (D.C. Cir. 2006), although in this case Defendants did both.

195.    Morad was violently seized by Defendants on January 10, 2018, when IRGC agents arrested and detained him.  He was detained and held hostage for 2,077 days, from January 10, 2018 until September 18, 2023, in Evin Prison, where he was brutally mistreated, abused, and tortured.  He was held in solitary confinement for months and was repeatedly subjected to violent interrogations and squalid living conditions and was denied essential medical care, leaving him with lasting life-long injuries.  He was held for five-and-three-quarters years without any basis in fact or law.  He was never properly charged, tried, or sentenced in accordance with due process of law.  To the contrary, he was denied access to counsel of his choosing, allowed no opportunity to

present a defense, and convicted in a sham "trial" that resulted in a 10-year prison sentence without any evidence or semblance of due process.

196.    Morad's imprisonment had nothing to do with the rule of law.  Instead, Defendants held Morad hostage for the sole purpose of extracting concessions from the United States, United Kingdom, and/or other third parties:

a.    Throughout Morad's detention, Defendants and their agents repeatedly stated, and further demonstrated by their conduct, that they had seized Morad for the unlawful purpose of compelling the United States, the United Kingdom, or others to release Iranian funds, exchange Iranian nationals, and/or make other concessions.  *See* Sections XIV, XV, XVII, *supra*.

b.    The purported legal proceedings and "trial" to which Morad was subjected were a complete sham, conducted only as pretext to put greater pressure on the United States, the United Kingdom, and others, while obscuring Defendants' act of hostage taking.  Defendants denied Morad due process of law and prevented him from defending himself under law. Defendants presented no witnesses, documents, or other evidence to support their bogus charges against Morad.  As Defendants and their agents repeatedly admitted, they arrested and imprisoned Morad based on his U.S. and U.K. nationality and his value as leverage in Iran's efforts to obtain concessions from those countries.

c.    Defendants released Morad from illegal detention (along with several other U.S. hostages who were also wrongfully held by Defendants without legal justification) only after the United States agreed to unfreeze approximately $6 billion in Iranian assets and release certain Iranian nationals in U.S. custody.  *See* ¶¶ 141, 150-152, *supra*.

197.    Defendants' hostage taking caused Morad numerous physical injuries and serious health problems.  *See* Section X, *supra*.  For example, Morad suffered numerous COVID-19

infections, urinary tract infections, urethral strictures, bursitis of the hip, kidney problems, permanent loss of hearing, and other such injuries. Defendants compounded his suffering from these physical injuries by denying him necessary medical care and medication, and subjecting him to unnecessary and toxic chemotherapy. The full measure of Morad's physical injuries is likely not yet apparent.

198.    Morad suffered, and continues to suffer, from acute psychological and emotional injury and other pain and suffering as a direct result of Defendants' hostage taking, which included abusive interrogations, solitary confinement, lack of medical care, inadequate nutrition, dehydration, physical abuse and distress, intimidation and disorientation, and denial of due process. While in prison, Morad experienced hopelessness and hallucinations. Since his release, he has had trouble sleeping and has suffered from fatigue. His relationships with his family and friends have been permanently transformed by his experiences during his unjust and illegal imprisonment.

199.    Morad has also suffered economic and financial injuries and losses from Defendants' hostage taking. At the time of his arrest, Morad was a successful businessman and real estate investor. Defendants' hostage taking ruined his business, kept him from pursuing any business opportunities, and destroyed his career and livelihood. As a result of Defendants' actions, Morad no longer has the successful career he had built over the decades before his detention. Defendants also caused economic injury by prohibiting Morad from liquidating family assets in Iran, pursuing claims to family properties in Iran, or otherwise realizing the economic value of his family's property and claims.

## COUNT TWO

### PERSONAL INJURY CAUSED BY TORTURE (MORAD)

200.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

201.    Under the terrorism exception to the FSIA, torture is defined to "have the meaning given … in section 3 of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note)."  28 U.S.C. § 1605A(h)(7).  The Torture Victim Protection Act defines torture as "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind."  Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 (note)).

202.    Morad was in the custody or control of Defendants from January 10, 2018 until September 18, 2023.  During that five-and-three-quarters years period, Morad was relentlessly and harshly interrogated.  He was subjected to constant threats, including threats of death and dismemberment.  In addition to threatening Morad, his captors threatened to murder or harm his family, including his wife who was unable to leave Iran, and his children back in the United States and the United Kingdom.

203.    Morad was subjected to grueling, full-day interrogation sessions involving severe physical and psychological strain which sometimes occurred multiple times in a single day and night.  He was hit so hard by interrogators that he suffered permanent hearing loss in his left ear. He was pushed down concrete stairs while blindfolded and repeatedly slammed into concrete walls.  He was intimidated, disoriented, and blindfolded when he was moved around the prison; denied access to counsel and family members; and physically threatened and abused,

psychologically abused, and faced with threats to the safety and security of his wife, children, and others.

204.    Throughout his time in detention, Morad was provided inadequate nutrition and water and was denied access to appropriate medical care or sanitary facilities.  This deprivation of basic care caused Morad to develop severe infections and physical injuries as well as to lose more than 60 pounds during his detention.

205.    Morad was held in solitary confinement twice: first for 70 days and then for another 20 days.  While in solitary confinement, Morad was held in a filthy cell with no bed and permitted no human interaction, outside of abusive and violent interrogations.  Defendants illuminated his room 24 hours a day to prevent Morad from sleeping, and he was forced to sleep on the cold, concrete floor.  The extreme isolation and deplorable living conditions caused Morad emotional and psychological anguish, extreme distress, and prolonged physical and mental pain and suffering.

206.    Defendants' mistreatment of Morad constitutes torture within the meaning of the FSIA.  *See Rezaian*, 422 F. Supp. 3d at 177 (hostage was tortured when "[he] was arrested at gunpoint, held in unsanitary conditions and solitary confinement, threatened with death and dismemberment …, and provided inadequate food and medical care"); *Kilburn*, 699 F. Supp. 2d at 152 (hostage experienced torture in the form of "beatings, unsanitary conditions, inadequate food and medical care, and mock executions"); *Regier*, 281 F. Supp. 2d at 91-92, 97 (victim was "tortured" when captors threatened him with death, confined him in "deplorable and inhumane conditions" for 65 days, fed him a monotonous and inadequate diet causing him to lose approximately 60 pounds, and subjected him to psychological torment, such as falsely telling him "that he was about to be released"); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 32

(D.D.C. 2001) (finding "deprivation of adequate food, light, toilet facilities, and medical care for 564 days amounts to torture"); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 45 (D.D.C. 2001) (finding long-term imprisonment and "deprivation of adequate food, light, toilet facilities, and medical care" constituted torture).

207.    Defendants' torture of Morad resulted in physical injury, including permanent hearing loss, severe back pain, and continued urinary tract issues requiring frequent removal of strictures arising from untreated or poorly treated medical conditions.

208.    Defendants' torture of Morad resulted in severe psychological and emotional injuries, including symptoms of depression and hallucination.

## COUNT THREE

### ASSAULT (MORAD)

209.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

210.    "An actor is subject to liability to another for assault if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension." Restatement (Second) of Torts § 21 (Am. Law Inst. 1965).

211.    Hostage taking and torture under the FSIA constitute assault because "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010).

212.    Morad was held hostage and tortured by Defendants, resulting in harmful contact and an imminent apprehension of such harmful contact.  Among other things, he was physically struck in the head, slammed into walls, pushed down a flight of concrete stairs while blindfolded, and repeatedly threatened that he or his family would be subjected to violence and killed or maimed.

213.    While in Defendants' custody, Morad was frequently threatened with harmful and offensive physical contact, including death, dismemberment, beatings, and lashings. *See Rezaian*, 422 F. Supp. 3d at 178 (hostage was "repeatedly and credibly threatened with death and dismemberment," which was "sufficient to establish … assault"). These threats caused Morad to experience imminent apprehension that he could be killed, tortured, abused, or otherwise physically and emotionally injured. He constantly feared for his health and safety.

## COUNT FOUR

### BATTERY (MORAD)

214.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

215.    "An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." Restatement (Second) of Torts § 13 (Am. Law Inst. 1965). "Harmful contact is that which results in 'any physical impairment of the condition of another's body, or physical pain or illness.'" *Valore*, 700 F. Supp. 2d at 77 (quoting Restatement (Second) of Torts § 15).

216.    Hostage taking and torture under the FSIA constitute battery because "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." *Valore*, 700 F. Supp. 2d at 76.

217.    Morad was held hostage and tortured by Defendants, resulting in harmful contact and fear of such harmful contact.

218.    While in Defendants' custody, Morad was routinely subjected to harmful and offensive contact, including being forcibly moved by armed men, being forced to wear a blindfold, being punched in the head, being pushed down a flight of concrete stairs while blindfolded, being

given chemotherapy he did not need, and being forced to take unidentified medication without the supervision of medical professionals.

## COUNT FIVE

### FALSE IMPRISONMENT (MORAD)

219.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

220.    "(1) An actor is subject to liability to another for false imprisonment if (a) he acts intending to confine the other or a third person within boundaries fixed by the actor, and (b) his act directly or indirectly results in such a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it."  Restatement (Second) of Torts § 35.

221.    The unlawful arrest and imprisonment of U.S. citizens by Defendants constitutes false imprisonment.  *See, e.g.*, *Rezaian*, 422 F. Supp. 3d at 179; *Jenco*, 154 F. Supp. 2d at 34; *Sutherland*, 151 F. Supp. 2d at 49.

222.    From January 10, 2018 until September 18, 2023, Defendants unlawfully detained Morad in Evin Prison—an institution that is known in Iran and internationally for its brutal mistreatment of hostages, political prisoners, and human rights defenders—on entirely fabricated charges of spying for foreign governments.  Morad was aware of this illegal detention.  Morad has suffered and continues to suffer physical, economic, emotional, and psychological harm as a result of this illegal detention.

## COUNT SIX

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (MORAD)

223.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

224.    "An actor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional harm to another is subject to liability for that emotional harm and, if the emotional harm causes bodily harm, also for the bodily harm."  Restatement (Third) of Torts:

Liability for Physical & Emotional Harm § 46 (Am. Law Inst. 2012); *accord Valencia*, 774 F. Supp. 2d at 14; *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 28 (D.D.C. 2008).

225.    "All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress[.]" *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (D.D.C. 2009) (quoting *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).  Acts of terrorism under the FSIA—such as hostage taking and torture—are therefore "sufficiently outrageous and intended to inflict severe emotional harm" to impose liability on defendants. *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d, 22, 40 (D.D.C. 2016) (quoting *Heiser*, 659 F. Supp. 2d at 27).

226.    By establishing that he was taken hostage or tortured by Defendants and that emotional distress resulted, Morad has established his right to recovery for intentional infliction of emotional distress.  *See Rezaian*, 422 F. Supp. 3d at 179; *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 400-401 (D.D.C. 2015); *Valencia*, 774 F. Supp. 2d at 14.

227.    Defendants' conduct in holding Morad hostage and inflicting torture upon him caused Morad to suffer severe emotional harm, including depression, fatigue, inability to work, and irreparable harm to his relationships with his wife, children, mother, sister, and other friends and family.

## COUNT SEVEN

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS/SOLATIUM (TARA VIDA TAHBAZ, TEYMOOR NADER TAHBAZ, ROXANNE VIDA TAHBAZ, TARANEH TAHBAZ, AND HAMIDEH AFSHAR)

228.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

229.    "An actor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional harm to another is subject to liability for that emotional harm and, if the emotional harm causes bodily harm, also for the bodily harm."  Restatement (Third) of Torts:

Liability for Physical & Emotional Harm § 46; *accord Valencia*, 774 F. Supp. 2d at 14; *Acosta*, 574 F. Supp. 2d at 28.

230.    When a defendant's conduct is directed at a third person, the Restatement generally requires that a plaintiff be a "close family member" and have "contemporaneously perceive[d] the event."   Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 46 cmt. m; *accord Valencia*, 774 F. Supp. 2d at 14.

231.    "All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience."  *Heiser*, 659 F. Supp. 2d at 27 (quoting *Stethem*, 201 F. Supp. 2d at 89).

232.    Because Morad was taken hostage and tortured, Plaintiffs need only demonstrate that they are close family members, and that emotional distress did result, in order to state a valid theory of recovery for intentional infliction of emotional distress.  *See Rezaian*, 422 F. Supp. 3d at 179; *Roth*, 78 F. Supp. 3d at 401.

233.    Defendants' extreme and outrageous conduct in holding Morad hostage, inflicting torture upon him, and terrorizing him and the family caused Tara (Morad's daughter), Teymoor (Morad's son), Roxanne (Morad's daughter), Taraneh (Morad's sister), and Hamideh (Morad's mother) to suffer from severe emotional harm, including anxiety, stress, persistent feelings of guilt, loss of sleep, paranoia, loss of focus, and other harms.

## COUNT EIGHT

### LOSS OF PROPERTY (MORAD TAHBAZ, TARA VIDA TAHBAZ, TEYMOOR NADER TAHBAZ, ROXANNE VIDA TAHBAZ, TARANEH TAHBAZ, AND HAMIDEH AFSHAR)

234.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

235.    The FSIA allows for recovery for "reasonably foreseeable property loss … by reason of the same acts on which the action … is based." 28 U.S.C. § 1605A(d). Section 1605A(d)

"contains two causation elements: (1) the property loss must come 'by reason of' the [hostage taking or torture], and (2) the property loss must be a 'reasonably foreseeable' result of [hostage taking or torture]." *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 57 (D.D.C. 2012).

236.    As a result of his unlawful arrest and detention, Morad lost personal property taken from his person and from his in-laws' home where he was staying.  Morad also lost substantial real property because Defendants forced Morad to relinquish his and his family's legal rights to properties, prevented him from liquidating those properties, and further prevented him from asserting, protecting, and pursuing his rights and claims to additional properties in Iran. Defendants have also prohibited him from returning to Iran.  Morad incurred significant expenses asserting, protecting, and pursuing his rights and claims to property and has incurred the loss of those expenses, as well as the loss of his property and property rights.  Specifically, Defendants have deprived him of family properties and the ability to further assert, protect, and pursue his family's rights with respect to properties illegally expropriated by the Iranian Government.  These losses occurred "by reason of" and were a "reasonably foreseeable" result of Defendants' hostage taking, torture, and other crimes, including unlawful arrest and detention.

237.    In addition, other named Plaintiffs and family members acting on Morad's and Vida's behalf expended significant time and resources in order to secure Morad's release.  These costs included legal, administrative, travel, food, and lodging expenses associated with the campaign to free Morad and bring Morad and Vida home to the United States.  These expenses and opportunity costs occurred "by reason of" and were a "reasonably foreseeable" consequence of Defendants' hostage taking and torture of Morad.

## REQUEST FOR RELIEF

238.    WHEREFORE, Plaintiffs demand judgment against all Defendants and respectfully request the following relief:

239.    Morad is entitled to compensatory damages for personal injury, assault, battery, false imprisonment, and intentional infliction of emotional distress suffered as a result of hostage taking and torture.

240.    Tara, Teymoor, Roxanne, Taraneh, and Hamideh are entitled to solatium damages for hostage taking, torture, and other torts (under 28 U.S.C. § 1605A(c)).

241.    All Plaintiffs are entitled to economic and special damages and other compensation for property losses suffered as a result of Morad's detention, including the lost ability of the Tahbaz Family to vindicate their rights in the Iranian properties.

242.    All Plaintiffs are entitled to consequential damages for their lost earning potential, lost value of asset recovery, and other long-term damages.

243.    All Plaintiffs are entitled to aggravated damages for Defendants' cruelty, torture, and abuse.

244.    All Plaintiffs are entitled to disgorgement damages for Defendants' unlawful monetary and other benefits obtained from Morad's properties and property claims in Iran and/or obtained in exchange for Morad's release.

245.    All Plaintiffs are otherwise entitled to recovery of costs and expenses, including legal, travel, food, lodging, and other costs and expenses.

246.    All Plaintiffs are further entitled to general damages and all other applicable damages.

247.    Punitive damages should be assessed (under 28 U.S.C. § 1605A(c)).

248.    The Court should award Plaintiffs their full costs and attorneys' fees as incidental damages and as otherwise appropriate.

249.    The Court should grant such further and other relief as this Court deems just and proper.

Dated:  September 13, 2024                    Respectfully submitted,

                                                       */s/ David W. Bowker*

DAVID W. BOWKER (DC Bar No. 989309)
JUSTIN R. METZ (DC Bar No. 90019815)
ADAM M. GERARD (DC Bar No. 90017466)
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
david.bowker@wilmerhale.com
justin.metz@wilmerhale.com
adam.gerard@wilmerhale.com

ALYSON ZUREICK (*pro hac vice forthcoming*)
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
Fax: (492) 230-8888
alyson.zureick@wilmerhale.com

*Counsel for Plaintiffs*